[No. 31104-2-I.    Division One.    January 17, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. DEAON L. FERGUSON, *Appellant*.

*Brett A. Purtzer* of *Law Office of Monte Hester,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Michael Thomas Jeremiah Hogan, Deputy,* for respondent.

KENNEDY, J. — Deaon Ferguson appeals his conviction of vehicular homicide, contending (1) that the trial court erred in failing to suppress his inculpatory statements made to police officers at the scene of the fatal accident before Ferguson was given his *Miranda* warnings;[1] and (2) that the trial

---

[1]Ferguson also assigned error to the trial court's failure to enter findings of fact and conclusions of law for the CrR 3.5 suppression hearing, and asked for dismissal of the charges pursuant to *State v. Smith,* 68 Wn. App. 201, 211, 842 P.2d 494 (1992). The State then requested leave of this court to supplement the record, which was granted. Thereafter, the State provided this court with a conformed copy of findings of fact and conclusions of law for the suppression hearing, but failed to designate supplemental clerk's papers as required by RAP 9.6. Accordingly, the record on appeal does not contain the official findings of fact and conclusions of law.

We will neither reverse and dismiss the charge on this ground, nor exercise our discretion under RAP 9.10 to direct transmission of supplemental clerk's papers. The record on appeal and the trial court's oral decision are sufficiently comprehensive to permit meaningful review of the single disputed issue of whether the police interrogations of Ferguson at the accident scene were "custodial" in nature. *Cf. State v. Clark,* 46 Wn. App. 856, 859, 732 P.2d 1029 (court chose to overlook trial court's failure to enter findings and conclusions following CrR 3.6 suppression hearing because "comprehensive oral opinion and the record of the hearing render[ed] the error harmless"), *review denied,* 108 Wn.2d 1014 (1987).

court erred in refusing to instruct the jury that vehicular homicide by disregard for the safety of others (aggravated negligence) is a lesser included offense of vehicular homicide by operating a vehicle in a reckless manner. Finding no error, we affirm.

## FACTS

Shortly after 11:30 p.m. on June 8, 1991, Defendant Ferguson drove his Volkswagen Fox northbound on 124th Street into the intersection of 124th and the Kent-Kangley Road, headlong into the passenger side of an eastbound Nissan Pulsar which was passing through the intersection at the same time. Raymond Carver, an occupant of the Pulsar, died at the scene of the accident. Terrina Rowan, the other occupant of the Pulsar, was seriously injured. Ferguson was injured slightly when his head struck the windshield of his car, cracking the windshield.

From the disputed evidence at the trial, a rational jury could have concluded either that Ferguson ran a red light or that the Pulsar ran a red light or that the Pulsar made a left turn directly in front of the Volkswagen, both vehicles entering the intersection on a green light.[2]

The speed limit for the Kent-Kangley Road was 45 m.p.h. The speed limit for 124th was 35 m.p.h. The State's expert believed that the Pulsar and the Volkswagen each entered the intersection at or about the posted speed limit for its respective direction of travel. The Volkswagen skidded 52 feet from the point of impact, at a postcollision speed between 24 and 33 m.p.h. The Pulsar, which was essentially

---

[2]Audrey Hall, the only independent eyewitness to the collision, was westbound on the Kent-Kangley Road. She testified that the Pulsar was eastbound on Kent-Kangley and that she and the Pulsar had the green light. The State's traffic accident reconstructionist testified that he believed the Pulsar came from the west. Ferguson testified that he entered the intersection on a green light and did not see the Pulsar at all. Ferguson's expert testified that the physical evidence was consistent with either of two theories: that the Pulsar came from the west, or that it came from the north and made a left turn directly in front of the Volkswagen; he favored the latter theory, due to certain aspects of the physical evidence. Ms. Rowan, who owned the Pulsar, had amnesia after the accident and was unable to shed light on the Pulsar's direction of travel.

torn in half by the impact, traveled 90 feet from the point of impact, dragging its semisevered rear passenger compartment behind it.[3] The State's expert was not able to determine the postcollision speed of the Pulsar.

The first police officer to arrive on the scene was an off-duty sheriff's deputy, Officer Garnett, who happened to be driving by. By department policy, he was required to render assistance until on-duty police arrived. After learning that 911 had been called and that a licensed practical nurse (Audrey Hall) was trying to help Carver and Rowan, Officer Garnett approached Ferguson. Ferguson was out of his car, seated on a grassy knoll at the northeast corner of the intersection.

Garnett asked Ferguson if he had been driving the Volkswagen. Ferguson answered yes. Garnett asked for Ferguson's driver's license. Ferguson responded that it was in his vehicle. From Ferguson's facial expression and general demeanor, Garnett believed Ferguson to have been drinking. He asked Ferguson if this was so. Ferguson stated that he had been drinking. Garnett asked how much. Ferguson admitted to two mixed drinks.

Garnett then assisted with traffic control, but kept an eye on Ferguson, as a bystander had said Ferguson had been trying to leave the area.

Trooper Larrigan of the Washington State Patrol arrived at the scene shortly after midnight. Garnett handed him Ferguson's driver's license and told him Ferguson had been drinking. Larrigan approached Ferguson and asked if he had been drinking. Ferguson said that he had had a couple of drinks. By this time, an aid crew was assisting Ferguson. Larrigan told the crew not to transport Ferguson to the hospital just yet, and went to check on the people in the Pulsar and to get his accident report forms out of his patrol car.

---

[3]Ferguson's expert testified that the Pulsar is a unibody car, which is welded together without benefit of a mainframe, and which can easily be torn apart by a T-bone collision such as this one, even at relatively low speeds.

Learning that Carver had died at the scene, Larrigan returned to Ferguson, who by then had been strapped to a backboard and placed in an ambulance. Larrigan told Ferguson he was under arrest for vehicular homicide and read him his *Miranda* rights. Ferguson stated that he wanted to talk to a lawyer. He was asked no further questions.

Larrigan asked a member of the aid crew to draw blood samples from Ferguson, and this was done. Ferguson was then transported to the hospital. Two hours later, Ferguson was released, not to police custody but into the care of his roommate.

Ferguson's blood test revealed a .19 percent blood alcohol level,[4] nearly twice the legal limit for drivers in this state.

Ferguson was charged with vehicular homicide by two of the three statutory alternative means, the driving while under the influence (DWI) means and the recklessness means.[5]

In a pretrial suppression hearing, Ferguson sought to have his statements to Officer Garnett and Trooper Larrigan that he had been drinking suppressed, in that these statements were made before he was given his *Miranda* warnings.

Officer Garnett testified at the suppression hearing that Ferguson had not been free to leave the scene at the time Garnett questioned him. Referring to Ferguson's statutory duty to remain at the scene of an injury accident, Garnett stated that if Ferguson had tried to leave, Garnett would have restrained him.[6] Trooper Larrigan testified that Fergu-

---

[4]Carver's postmortem blood alcohol level was .05 percent. Rowan's blood alcohol level was .12 percent. Although Rowan testified that she believed she must have been driving the Pulsar, as she always drove her own car, Carver was found strapped in the driver's seat immediately after the impact.

[5]RCW 46.61.520 provides:

"(1) When the death of any person ensues within three years as the proximate result of injury proximately caused by the driving of any vehicle by any person, the driver is guilty of vehicular homicide if the driver was operating a motor vehicle:
"(a) While under the influence of intoxicating liquor . . . or
"(b) In a reckless manner; or
"(c) With disregard for the safety of others.
"(2) Vehicular homicide is a class B felony punishable under chapter 9A.20 RCW."

[6]*See* RCW 46.52.020(1), (3), (4) and (7) regarding a driver's duty to remain at the scene of an injury accident to give identifying and insurance information, and

son was free to leave the scene at the time Larrigan first contacted him.

The trial judge denied Ferguson's motion to suppress, ruling that Ferguson was not "in custody" as defined by *Berkemer v. McCarty*, 468 U.S. 420, 82 L. Ed. 2d 317, 104 S. Ct. 3138 (1984) and *State v. Sargent*, 111 Wn.2d 641, 762 P.2d 1127 (1988) at the time he responded to the questions of Officer Garnett and Trooper Larrigan. The case then proceeded to trial.

After both sides had rested, Ferguson asked the trial judge to instruct the jury that operation of a motor vehicle with disregard for the safety of others, the third (uncharged) statutory means of committing vehicular homicide, is a lesser included offense of operation of a motor vehicle in a reckless manner.[7] This the trial judge declined to do, although he did instruct the jury that DWI and negligent driving were lesser included offenses, respectively, of negligent homicide by the DWI and recklessness means.[8]

The jury returned a general verdict of guilty of vehicular homicide. This timely appeal followed.

## Discussion

### I

### Custodial Interrogations

Ferguson first contends that the trial court erred in determining that he was not "in custody" for purposes of

---

RCW 10.31.100 permitting police to arrest without a warrant for failure of a driver to remain at the scene of an injury accident as required by RCW 46.52.020.

[7] RCW 9.94A.320 provides that vehicular homicide by the DWI and recklessness means has a seriousness level of 8, but that vehicular homicide by disregard for the safety of others (aggravated negligence) has a seriousness level of 7. This difference results in a lower standard sentencing range for the aggravated negligence means. *See* RCW 9.94A.310. Moreover, vehicular homicide by the DWI and recklessness means is a "violent" offense, but vehicular homicide by aggravated negligence is not. *See* RCW 9.94A.030(36). Thus, a person convicted of the aggravated negligence means is eligible for "first-time offender" status, but a person convicted of the other two means is not. *See* RCW 9.94A.030(20)(a); RCW 9.94A.120(5).

[8] The State has not cross-appealed this ruling. Accordingly, we do not address it. But see discussion of *State v. Curran*, 116 Wn.2d 174, 804 P.2d 558 (1991), *infra*.

*Miranda*[9] when Officer Garnett and Trooper Larrigan questioned him about his drinking as he sat on the grassy knoll at the scene of the accident. The trial court did not err.

■ "Custody" for the purposes of *Miranda* is narrowly circumscribed and requires formal arrest or restraint on freedom of movement to a degree associated with formal arrest. *State v. Post*, 118 Wn.2d 596, 606, 826 P.2d 172, 837 P.2d 599 (1992); *State v. Sargent*, 111 Wn.2d at 649-50. The inquiry into restraint is an objective one: how would a reasonable person in the suspect's position have understood the situation? *Berkemer*, 468 U.S. at 442. The issue is not whether a reasonable person would believe he or she was not free to leave, but rather "whether such a person would believe he was in police custody of the degree associated with formal arrest". 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 6.6, at 105 (Supp. 1991).

In *Berkemer*, the United States Supreme Court said:

> [T]he usual traffic stop is more analogous to a so-called "Terry stop," see *Terry* v. *Ohio*, 392 U. S. 1 (1968), than to a formal arrest. Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has committed . . . a crime, may detain that person briefly in order to investigate the circumstances that provoke suspicion. [T]he stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. . . . The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*.

(Footnotes, citations and some quotation marks omitted.) *Berkemer*, 468 U.S. at 439-40. *Accord Heinemann v. Whitman Cy.*, 105 Wn.2d 796, 808, 718 P.2d 789 (1986) (request

---

[9]*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 88 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

for performance of field sobriety tests during routine traffic stop does not amount to custody so as to require *Miranda* warnings).[10]

Ferguson argues that *Berkemer* does not apply because there is nothing "ordinary" or "routine" about the investigation of a vehicular homicide. We disagree. The seriousness of the potential traffic charge does not alter the analysis. Certainly, a driver who is involved in a fatality road accident is likely to be detained longer than a driver who is pulled over for committing a relatively minor traffic infraction. But as the Supreme Court noted in *Berkemer*, 468 U.S. at 439 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)), " '[t]he stop and inquiry must be "reasonably related in scope to the justification for their initiation." ' "

An argument similar to Ferguson's was rejected in *Cordoba v. Hanrahan*, 910 F.2d 691 (10th Cir.), *cert. denied*, 498 U.S. 1014 (1990). There, the driver also argued that he was in custody for purposes of *Miranda* because the investigation of an automobile accident is more coercive than a routine traffic stop. A police officer came upon the scene of a motor vehicle accident and found the driver leaning against his damaged automobile. The officer asked what happened. The driver responded that he had been drinking and driving. Thereafter, the driver was arrested and given his *Miranda* warnings.

At the ensuing suppression hearing the officer testified that the driver was not free to leave until the officer finished his investigation. The court held that, like a routine traffic stop, the investigation of an automobile accident is analogous to a *Terry* stop:

---

[10]In *Heinemann*, 105 Wn.2d at 805-08, as well as in *State v. Harris*, 106 Wn.2d 784, 790, 725 P.2d 975, *cert. denied*, 480 U.S. 940 (1987), our Supreme Court determined that its adoption of the *Berkemer* analysis modified the "probable cause to arrest" standard adopted by the court in *State v. Creach*, 77 Wn.2d 194, 198, 461 P.2d 329 (1969). Accordingly, even if Ferguson is correct when he argues in his brief that the officers had probable cause to arrest him when they asked him the questions (an issue not argued below), Ferguson's reliance on the probable cause to arrest standard set forth in *Creach* is misplaced. Accordingly, we will not further address those arguments.

An officer arriving at the scene of an accident, therefore, may ask a person apparently involved in the accident a moderate number of questions to determine whether he should be issued a traffic citation, whether there is probable cause to arrest him, or whether he should be free to leave after the necessary documentation has been exchanged.

*Cordoba*, 910 F.2d at 694. We agree.[11]

We hold that neither Officer Garnett's determination that if Ferguson had tried to leave the scene, Garnett would have restrained him in view of Ferguson's statutory duty to remain at the scene of the injury accident, nor Trooper Larrigan's direction to the aid crew not to transport Ferguson to the hospital just yet, nor the fact that this was a fatality accident, standing alone or taken together, changed Ferguson's temporary detention from a *Terry* stop to a custodial arrest for purposes of *Miranda*.

Turning now to the specific facts of this case, we note that both officers questioned Ferguson as he sat on a grassy knoll near the intersection, in full view of various civilian witnesses. The questions were brief and nondeceptive. Ferguson was asked straightforwardly whether he had been drinking.[12]

We find nothing in these facts to distinguish Ferguson's situation from that of the drivers in *Berkemer* and *Cordoba*. Accordingly, we affirm the trial court's decision to allow the State to introduce Ferguson's responses into evidence during its case in chief.

## II

### Jury Instructions

Ferguson next contends that the trial court erred by refusing to instruct the jury that driving with disregard for the

---

[11]In *Miranda v. Arizona*, 384 U.S. at 477, the Supreme Court said: "Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime . . . is not affected by our holding." (Citation omitted.)

[12]In Washington, courts look not only to whether pre-*Miranda* questioning is noncoercive but also to whether the questioning is nondeceptive. *See Heinemann*, 105 Wn.2d at 808. A driver who has just been involved in a car accident and who is asked by an investigating officer whether he or she has been drinking could hardly be deceived as to the reason for the question: the officer obviously is investigating fault for the accident.

safety of others, the only means of committing vehicular homicide with which Ferguson was not charged, is a lesser included offense of the recklessness means. The trial court did not err.

Although this precise issue is one of first impression, we believe the result must be controlled by our Supreme Court's decisions in *State v. Curran*, 116 Wn.2d 174, 183, 804 P.2d 558 (1991) and *State v. Davis*, 121 Wn.2d 1, 4-7, 846 P.2d 527 (1993). *See also State v. Hurchalla*, 75 Wn. App. 417, 421-22, 877 P.2d 1293 (1994).

First, we acknowledge that, logically, disregard for the safety of others would appear to be a lesser included offense of recklessness. *See State v. Eike*, 72 Wn.2d 760, 765-66, 435 P.2d 680 (1967), in which our Supreme Court defined "disregard for the safety of others" as "an aggravated kind of negligence or carelessness, *falling short of recklessness* but constituting a more serious dereliction than the hundreds of minor oversights and inadvertences encompassed within the term 'negligence.' " (Italics ours.) *Accord State v. Jacobsen*, 78 Wn.2d 491, 498, 477 P.2d 1 (1970). *See also State v. May*, 68 Wn. App. 491, 495-96, 843 P.2d 1102 (1993) (Sentencing Reform Act of 1981 sentencing structure assigning a higher seriousness level to recklessness means of committing vehicular homicide than to the aggravated negligence means does not violate equal protection because these means of committing the crime are distinguishable, citing definitions contained in *Eike* and *Jacobsen*).

The Supreme Court has developed a 2-part test for determining when a lesser included offense instruction is appropriate:

> First, each of the elements of the lesser offense must be a necessary element of the offense charged. Second, the evidence in the case must support an inference that the lesser crime was committed.

(Citations omitted.) *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). We agree with Ferguson that both prongs of the *Workman* test are met in this case, insofar as

the recklessness and aggravated negligence means are concerned. But this does not end the inquiry.

In *Curran*, 116 Wn.2d at 183, the Supreme Court held that reckless driving is not a lesser included offense of vehicular homicide because vehicular homicide can be committed by other means than the recklessness means. In *Davis*, 121 Wn.2d at 5-6, the court explained further: a lesser included offense instruction is not available whenever alternative means exist for committing the crime charged. Regardless of the evidence in a given case, if it is theoretically possible to commit the greater offense without having committed the lesser offense, the latter is not an included crime. In *Hurchalla*, 75 Wn. App. at 422, this court, in applying *Curran* and *Davis* to the second degree assault (with a deadly weapon) and unlawful display of a weapon statutes, noted that these two cases, read literally, stand for the proposition that if alternate means of committing a crime exist and the lesser offense does not have to be committed to commit the crime by *all* of those alternative means, regardless of which among several means may actually have been charged, then there cannot be a lesser included offense. We agree that this is the clear meaning of *Curran* and *Davis*.[13]

Assuming that an uncharged alternative means could ever be a lesser included offense of another alternative means simply because the Legislature has assigned a lower seriousness level to the uncharged means, under *Curran* and *Davis* the uncharged lesser means would still have to be a lesser included offense to *all* the statutory alternative means, even

---

[13]Thus, we necessarily disagree with another panel of this court when it said in *Seattle v. Wilkins*, 72 Wn. App. 753, 757 nn.3, 4, 865 P.2d 580 (1994) that if the defendant in *Curran* had been charged with vehicular homicide by the recklessness means a lesser included offense instruction on reckless driving would have been proper; and that *Curran* can be interpreted to mean that as long as the lesser included offense satisfies the *Workman* test for the crime charged a lesser included instruction should be given when requested even if the lesser offense would not be a lesser included as to other uncharged (and therefore hypothetical) alternatives of the greater offense. We agree with the *Wilkins* panel that *Davis* goes too far. Nevertheless, we are bound by the Supreme Court's own interpretation of *Curran* as contained in *Davis*.

those which were not charged. Here, both the DWI and recklessness means were charged. We can readily agree that aggravated negligence is a lesser included mental state of recklessness, but the DWI means requires either no mental state whatsoever, or at most, the mental state of ordinary negligence in combination with driving while under the influence.[14] Thus, it cannot be said that every element of the aggravated negligence means is a necessary element of the DWI means.

Accordingly, we hold that the trial court did not err in refusing Ferguson's proposed lesser included offense instruction.

## CONCLUSION

The trial court did not err in failing to suppress Ferguson's inculpatory statements to the police or in refusing to instruct the jury that the aggravated negligence means of committing vehicular homicide is a lesser included offense of the recklessness means.

Affirmed.

GROSSE and AGID, JJ., concur.

---

[14]In *State v. McAllister*, 60 Wn. App. 654, 658-59, 806 P.2d 772 (1991) Division Three of this court held that the proximate cause element of the DWI means of committing vehicular homicide requires a showing of driving while under the influence and ordinary negligence in combination. This would appear to be consistent with the Supreme Court's plurality holding in *State v. MacMaster*, 113 Wn.2d 226, 778 P.2d 1037 (1989) that the DWI means of committing vehicular homicide is not a strict liability crime. Because impairment due to alcohol must be the proximate cause of the accident, it would appear that the impaired driver must be shown to have committed an act of ordinary negligence, thereby proximately causing the accident.