FILED
COURT OF APPEALS
DIVISION II

2015 MAY 27 AM 8:33

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | | |
|---|---|---|
| STATE OF WASHINGTON, | | No. 45041-1-II |
| | Respondent, | |
| v. | | UNPUBLISHED OPINION |
| DENNIS LEE WOLTER, | | |
| | Appellant. | |

BJORGEN, A.C.J. — Dennis Lee Wolter appeals his convictions for aggravated first degree murder and witness tampering, claiming that (1) the trial court erred by admitting a number of statements he made to investigating officers, (2) the trial court improperly dismissed a juror during his trial, and (3) the jury's finding of one of the aggravating circumstances must be reversed due to instructional error and insufficient evidence. We hold that (1) the trial court did not err in admitting Wolter's statements, (2) the trial court did not abuse its discretion in dismissing the juror, and (3) Wolter's challenge to the aggravating circumstance is moot. We affirm.

## FACTS

### A.    Wolter's Terry[1] Stop and Arrests

In May 2011, a neighbor called 911 to report a loud and violent argument between Wolter and his girlfriend, Kori Fredericksen. Vancouver police officers responded and, after

---

[1] Terry v. Ohio, 392 U.S. 1, 20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). We refer to the officers' traffic stop of Wolter as a "Terry stop," because its legality is analyzed under Terry's requirements. See Parts I.A.3. and C. of the Analysis below.

investigating, arrested Wolter. The State charged Wolter with domestic violence fourth degree assault and domestic violence malicious mischief for the incident. At his first appearance for the charges, the Clark County District Court issued a no-contact order prohibiting Wolter from contacting Fredericksen.

Little more than a week after that first arrest, Officer Stefan Hausinger of the Camas Police Department stopped Wolter for speeding early in the morning on a deserted stretch of highway. When Hausinger approached the vehicle to speak with Wolter, he immediately smelled alcohol. Hausinger also noticed that Wolter's eyes were bloodshot, which led Hausinger to believe Wolter was intoxicated. More alarmingly, when Wolter produced his license and handed it to him, Hausinger noticed blood on Wolter's hands and face. On closer inspection, Hausinger noticed "more blood, not just on his hands and face, but all over his body." 2 Verbatim Report of Proceedings (VRP) at 201.

Hausinger asked Wolter "what had happened and . . . if he was okay." 2 VRP at 201. Wolter explained that the blood was not his, but instead had come from his dog, who had been hit by a car in Portland. Wolter's story was quite detailed, providing the dog's breed, name, age, and the facts of the accident. Wolter stated that the dog's blood had soaked him and his clothing when he had picked it up to take it to a 24-hour veterinary clinic, where it died and was disposed of.

Hausinger returned to his car, requested back-up so that he could perform field sobriety tests on Wolter, and requested a check on Wolter's license, which turned up a felony arrest warrant matching Wolter's name and date of birth. Hausinger then asked dispatch to confirm the warrant.

No. 45041-1-II

When back-up arrived, Hausinger again approached Wolter's car and asked him to step out and perform several voluntary field sobriety tests. Wolter assented and two of the tests indicated that alcohol consumption had impaired his ability to drive. Hausinger then asked Wolter to provide a voluntary preliminary breath test. Wolter again assented and the test disclosed a blood alcohol content below the legal limit.

After finishing the field sobriety tests, Hausinger told Wolter he needed to verify the story about the dog before Wolter could leave and asked how he could do so. Wolter gave Hausinger the name of a friend he said he had been with and also told Hausinger that the receipt from the veterinary clinic's disposal of the dog's body was in his truck and would confirm his story.

By this point, Officer William Packer and Sergeant Douglas Norcross had arrived. Hausinger and Norcross discussed the situation while Packer stood with Wolter at the back of Wolter's truck. Packer, who believed that Wolter had received the Miranda[2] warnings, asked Wolter about the blood, and Wolter repeated his story about his dog.

Hausinger and Norcross decided that a search for the receipt might resolve the situation. Hausinger informed Wolter of his Ferrier[3] rights and asked for permission to search the truck, which Wolter gave. While Hausinger performed the search, Norcross replaced Packer at the back of Wolter's truck and "just kind of engaged [Wolter] in conversation." 2 VRP at 280. Wolter again told the same story about his dog. Norcross, who found it odd that Wolter would have been travelling on the old highway instead of the new, main one, asked Wolter about his

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] State v. Ferrier, 136 Wn.2d 103, 118-19, 960 P.2d 927 (1998).

3

route. Wolter stated that he had needed to relieve himself and had been looking for an isolated place to do so. Packer, meanwhile, attempted to verify Wolter's story by contacting veterinary clinics in Portland. He was able to find one clinic matching Wolter's description, but it denied that Wolter had come in that night.

Hausinger's search of Wolter's truck failed to turn up a receipt for a veterinary clinic visit. Hausinger did, however, find the no-contact order issued by the Clark County District Court forbidding Wolter from contacting Fredericksen. When asked about the order, Wolter assured the officers that the court had rescinded it that day because Fredericksen had recanted her story.

The officers then conferenced on how to proceed. By this point, Wolter had told the officers that he had been on his way to visit Fredericksen. Norcross ordered an officer to try to contact her by phone and, when that failed, by driving to find her apartment complex. The officers also decided to ask the Vancouver police officers to perform a welfare check at Wolter's residence "to make sure that there was nobody at the house who was injured or in need of any medical help, due to the amount of blood" on Wolter and his clothing. 2 VRP at 220.

While waiting for the results of the welfare check, dispatch confirmed the existence of the warrant, and Hausinger confirmed that the description on the warrant matched Wolter. Hausinger placed Wolter under arrest for both the warrant and negligent driving, handcuffed him, and read him the *Miranda* warnings. Wolter told Hausinger that he understood his rights and was willing to waive them. Hausinger then transported Wolter to the Camas Police Department for further questioning.

At the Camas Police Department, Hausinger received word that Vancouver police officers had discovered a "probable crime scene" at Wolter's house. 2 VRP at 230. Meanwhile, still bothered by Wolter's odd choice of a route home, Norcross traveled up the highway, looking for anything out of place on the side of the road. Approximately a mile up the road from where Hausinger stopped Wolter, Norcross found a bloody shoe on the road's shoulder. Norcross stopped, got out of his car, peered over the road's shoulder, and discovered Fredericksen's body down the steep embankment adjacent to the road.

After booking Wolter, Vancouver police detectives gave him the *Miranda* warnings and Wolter again agreed to waive them and speak with police. After questioning Wolter about his dog and other matters, the detectives told him that they wanted to test his clothing to make sure the blood was canine and not human. The request resulted in the following exchange touching on Wolter's right to counsel:

> [Wolter]:     [Y]ou're not getting anything from me without a warrant.
> [First Detective]: Okay. Fair call.
> [Second Detective]: Well, now, yeah, (inaudible)[.]
> [Wolter]:     I will not do that. Helpful – helpful to you all night long.
> [Second Detective]     Totally agree.
> [Wolter]     I've been sitting here. If you want something, get a warrant for it. And – and, you know what? I really don't care if you take it, but I am just saying.
> [Second Detective]     No, you're fine.
> [Wolter]     That's – that's something that is – you're going way over the line here.
> [First Detective]     I appreciate your honesty. And I appreciate you being forthcoming with that, okay?
> [Wolter]     But I think something like that, I'd like to have an attorney present for that.
> [Second Detective]     Truly, cool.
> [Wolter]     For anything else. If you're going to assume – you know, have your assumption of things. I told you what the blood was –
> [Second Detective]     Well, can I (inaudible) for one here?

[Wolter]     -- you're going to take this blood off – off me, you're going to have to have a warrant.

3 VRP at 378-79.

After a brief aside, one of the detectives asked Wolter about his request for counsel, saying, "So, for clarification, you're saying that when we get to this point of dealing with your clothing, that's where you need your attorney present with you[?]" 3 VRP at 381. Wolter responded, "Yeah, right. I will answer all your questions, I'll tell you what's going on . . . but that is, you know, it's like your attorney tells you, you know, you can't be doing that." 3 VRP at 382.

After that exchange, the detectives began explicitly asking Wolter whether Fredericksen was dead and whether he had killed her. They hinted that they had discovered Fredericksen's body, told him that Vancouver police detectives had found the bloody scene at his house, and made clear to him that they would use the deoxyribonucleic acid (DNA) evidence covering him to prosecute him for murder. Wolter continued to assert his innocence until he finally ended the interview by invoking his right to counsel.

After that interview, police transported Wolter to the Clark County Jail with another arrestee, Danielle Williams. When Williams asked Wolter what police had arrested him for, he replied, "Murder." 11A VRP at 2171. Williams then realized that she knew Wolter because she had dated Fredericksen's stepson, and she asked Wolter whom he had killed. Wolter told her that he had killed Fredericksen and done so because "she had narced on him." 11A VRP at 2173. Wolter later contacted Fredericksen's stepson from jail and asked him, obliquely, to convince Williams not to testify against him.

6

The State charged Wolter by amended information with aggravated first degree murder for the death of Fredericksen pursuant to RCW 10.95.020 and with witness tampering for attempting to induce Williams not to testify in violation of RCW 9A.72.120. The State alleged that the murder was aggravated by two of the circumstances prescribed in RCW 10.95.020, specifically, that: (1) "at the time [Wolter] committed the murder, there existed a court order . . . which prohibited [him] from either contacting the victim, molesting the victim, or disturbing the peace of the victim, and [he] had knowledge of the existence of that order" and (2) "Kori S. Fredricksen was a prospective, current, or former witness in an adjudicative proceeding and that the murder was related to the exercise of official duties to be performed" by Fredricksen.[4] Clerk's Papers (CP) at 326.

B.     The CrR 3.5 Hearing Regarding Wolter's Statements

Before trial, the trial court held an evidentiary hearing, as required by CrR 3.5, to determine the admissibility of Wolter's statements to police during the *Terry* stop and at the Camas Police Department. The trial court concluded that Wolter's initial statements to Hausinger during the *Terry* stop were admissible, despite the fact that he made them without receiving the *Miranda* warnings, because they were not the product of custodial interrogation. Rather, the court held Wolter's statements were the result of community caretaking questions associated with a *Terry* stop. The trial court determined that Wolter's other statements to officers at the scene, although given without receiving the *Miranda* warnings, were admissible

---

[4] The State also alleged that Wolter was armed with a deadly weapon when committing the murder, warranting an enhanced sentence under RCW 9.94A.533(4)(a). The jury found that Wolter was so armed and he has not appealed that finding.

7

No. 45041-1-II

because police obtained them in a *Terry* stop rather than custodial detention. The trial court concluded that Wolter's statements to detectives at the Camas Police Department were admissible because he had received the *Miranda* warnings, waived his rights to remain silent and to counsel, and told police that he wanted them to provide him with an attorney if they attempted to take his clothing as evidence. The trial court determined that Wolter's request for counsel was conditioned on future events, allowing police to continue the interrogation.

C.    The Trial

The trial court empaneled a jury, and the parties proceeded to trial. Five days into trial, juror 1 reported that someone had spoken to her about the case over the preceding weekend, a possible violation of the court's instructions to the jury. The trial court brought the juror in for voir dire so that the parties could inquire about the communication.

The juror stated that she had mentioned her jury duty to a friend who then asked if the juror was serving on Wolter's jury. Although the juror told the friend she could not discuss the matter further, he told her, without prompting, that he knew Wolter and had spent time in jail with him. The friend also related a brief conversation he had with Wolter during their shared incarceration.

Ultimately, the trial court asked the juror whether there was "anything about the conversation that would impair [her] ability to follow the Court's instructions on the law or the facts in the case?" 9A VRP at 1652. She replied, "No. I – I hope not. That's all I can – I've never done this before, so –[.]" 9A VRP at 1653. The defense followed up, asking the juror if there was "anything about [her] conversation with [her] friend . . . – that [was] impacting [her] thinking toward either party in this case?" 9A VRP at 1653. The juror responded,

8

Mmm, I don't know. I mean, to be honest, I think, if anything, to me, it just made it more, like, personable, or like – I don't know if the word, like, humane or something. Like just because – that's all. That's all I can tell you. That's it. It just made it more real, like, someone that I knew, like, had a discussion and that – I don't know. That's just all. I don't know – I don't know how I feel about it. It's weird. All of it is weird.

9A VRP at 1653.

The State moved, over defense objections, to dismiss the juror. The trial court granted the motion, stating,

I don't find that the juror, Juror Number 1, deliberately violated the order. Apparently, she misunderstood that she needed to be more aggressive in cutting off the conversation when it occurred. And the information that was related in itself is somewhat innocuous; however, I have to agree with the State that, *apparently, the – the person relating it to her and the type of information that was related seems to have had an effect on the juror's ability to be fair*. For that reason, I will excuse her and seat the first alternate.

9A VRP at 1657 (emphasis added).

The trial court then called the juror in and excused her, telling her that

I didn't particularly find that you had done anything wrong; you should have been more aggressive with your friend about getting them to cut off their statements to you. But the statements seemed to have had some effect on you and in an abundance of caution, I'm going to make sure that only jurors who don't have that sort of outside information in effect are seated.

9A VRP at 1658.

The State presented evidence that Wolter had killed Fredericksen and that the murder had been accompanied by the existence of several of the aggravating circumstances codified in RCW 10.95.020. The deputy prosecutor handling domestic violence cases in Clark County District Court in May 2011 testified about Wolter's prosecution for the assault and malicious mischief offenses committed a week before Fredericksen's murder. He testified that Fredrickson "was the named victim in the case and . . . was a witness for the State" and that she "would be the most

9

important witness for the State in the -- in the case." 10A VRP at 2009. The prosecutor also testified that Wolter was aware of the no-contact order between himself and Fredericksen and that it was in effect at the time of Fredericksen's murder. Williams testified that Wolter stated that he had killed Fredericksen because she had "narced" on him. 11A VRP at 2173.

The jury found Wolter guilty of first degree murder and witness tampering. The jury also returned special verdicts finding the two aggravating circumstances alleged by the State.

Wolter now appeals.

## ANALYSIS

### I. WOLTER'S STATEMENTS

Wolter contends that the trial court erred by admitting statements obtained by police at the scene of the *Terry* stop and during the interview with detectives after his arrest. After a brief survey of our standard of review and the principles set out in *Miranda* and its progeny, we address Wolter's claims in turn, holding against each of them.

A.     Applicable Legal Principles and Standard of Review

1. CrR 3.5

CrR 3.5 governs the admissibility of statements by a criminal defendant. The rule requires the trial court to hold a hearing and make findings of fact and conclusions of law concerning the admissibility of those statements. CrR 3.5.

We review challenged findings of fact entered after the trial court's CrR 3.5 hearing for substantial evidence. *State v. Rosas-Miranda*, 176 Wn. App. 773, 779, 309 P.3d 728 (2013). Substantial evidence is evidence sufficient to "persuade a fair-minded, rational person of the truth of the finding." *State v. Shuffelen*, 150 Wn. App. 244, 252, 208 P.3d 1167 (2009).

Unchallenged findings are verities on appeal. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). If the trial court's findings are unchallenged or supported by substantial evidence, we then review de novo whether those findings of fact support the trial court's conclusions of law. *Rosas-Miranda*, 176 Wn. App. at 779.

2. *Miranda*

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The due process clause of the Fourteenth Amendment to the United States Constitution incorporates this provision, making it applicable to action by the states. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).[5]

In *Miranda*, the United States Supreme Court "addressed the problem of how the privilege against compelled self-incrimination guaranteed by the Fifth Amendment could be protected from the coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation." *Berkemer v. McCarty*, 468 U.S. 420, 428, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (citing *Miranda*, 384 U.S. at 436). We review whether a suspect was in custody for purposes of *Miranda* by examining, under the totality of the circumstances, whether "'there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Thompson v Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275

---

[5] In his assignments of error, Wolter claims that the admission of his statements also violated article I, sections 9 and 22 of the Washington State Constitution. He offers no specific argument based on the state constitution, and we consider the claim of error waived. *State v. Goodman*, 150 Wn.2d 774, 782, 83 P.3d 410 (2004).

(1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977))).

The *Miranda* Court held that preserving the privilege against self-incrimination required that "custodial interrogation be preceded by advice to the putative defendant that he [or she] has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 481-82, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) (citing *Miranda*, 384 U.S. at 479). If police secure a valid waiver of these rights, they may freely question a defendant, *Davis v. United States*, 512 U.S. 452, 458, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), and the trial court may admit any statements the suspect makes to police during the interrogation. *Missouri v. Seibert*, 542 U.S. 600, 608-09, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). However, without such a waiver, any inculpatory statements obtained through custodial interrogation are generally inadmissible. *Seibert*, 542 U.S. at 608.

### 3. *Terry*

The state and federal constitutions generally prohibit the police from seizing a person without a warrant supported by probable cause. *State v. Menesee*, 174 Wn.2d 937, 942-43, 282 P.3d 83 (2012) (citing U.S. CONST. amend IV and WASH. CONST. art. I, § 7). Among the limited exceptions to this prohibition is an investigative detention, or *Terry* stop. *State v. Day*, 161 Wn.2d 889, 896, 168 P.3d 1265 (2007). A *Terry* stop is valid if "justified at its inception" and "reasonably related in scope to the circumstances which justified" the stop. *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *Day*, 161 Wn.2d at 895-96. A stop is justified at its inception where the detaining officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" allowing the

12

officer to detain a suspect without a warrant. *Terry*, 392 U.S. at 21; *Day*, 161 Wn.2d at 895-96. The stop is related in scope to the circumstances justifying it where brief and of limited intrusiveness. *Terry*, 392 U.S. at 24-27; *Day*, 161 Wn.2d at 895.

Where police detain a suspect in a traffic or *Terry* stop, they "significantly curtail[]" the detainee's "'freedom of action.'" *Berkemer*, 468 U.S. at 436, 439 (quoting OHIO REV. CODE ANN. § 4511.02 (1982)). These detainees are, however, not in custody for purposes of *Miranda* for two reasons. *Berkemer*, 468 U.S. at 437-40. First, traffic or *Terry* stops "[are] presumptively temporary and brief": the detainee can expect to answer a limited number of questions but will then likely "continue on his [or her] way." *Berkemer*, 468 U.S. at 437, 439-40. Second, traffic or *Terry* stops are less "'police dominated'" than jailhouse interrogations. *Berkemer*, 468 U.S. at 438-39. The stops occur in public, rather than in the hidden confines of a jailhouse, and involve a limited number of police officers. *Berkemer*, 468 U.S. at 438.

B.    The CrR 3.5 Findings of Fact and Conclusions of Law

Wolter assigns error to two of the trial court's findings and portions of three of its conclusions that he claims actually constitute findings. Appellant's Opening Br. at 2-3 (assigning error to findings of fact 7 and 9 and conclusions of law 3, 5, and 9). We treat "[s]tatements of fact included within conclusions of law" as factual findings and review them as such. *Kunkel v. Meridian Oil, Inc.*, 114 Wn.2d 896, 903, 792 P.2d 1254 (1990).

Substantial evidence supports each of the challenged findings that are actually factual findings.[6] Wolter first contends that the trial court's findings "misstate[] the timing of the police

---

[6] As later discussed, Wolter's challenges to conclusion of law three and nine are not factual and are addressed below as challenges to the trial court's legal conclusions.

investigation and reason" for his arrest. Br. of Appellant at 2. Hausinger, however, testified to the timing and reason for arrest found by the trial court. Thus, substantial evidence supports this challenged finding. Wolter next claims that the trial court erred by finding that the interview with city of Vancouver detectives only continued for "a few more minutes." CP at 231. The record shows that the interview following that first request for counsel was brief, thus supporting this finding. Wolter finally contends that the trial court erred by finding that the police clarified Wolter's first request for counsel just after he made it. The record shows exactly that.

C.      The *Terry* Stop

Turning now to the nature of the *Terry* stop, Wolter first argues that the statements obtained by police during it were the product of custodial interrogation performed without first providing him the *Miranda* warnings. For the reasons below, we hold that Wolter was not in custody during the *Terry* stop and, consequently, the trial court did not err by admitting the statements Wolter made during the stop.

Police stopped Wolter in what was essentially a combined traffic and *Terry* stop. The stop occurred on a public roadway and police asked him a limited number of questions, all directed toward confirming or disproving his explanation of how he had become covered in blood. The scope and duration of the stop was reasonably related to its legitimate purposes, determining whether Wolter or another person needed emergency medical attention and investigating the circumstances that reasonably led the officer to suspect Wolter may have committed a crime. *Berkemer*, 468 U.S. at 439 (quoting *United States v. Brignoni-Prince*, 422 U.S. 873, 881, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975)). Under *Berkemer*, Wolter was not in custody for purposes of *Miranda*. Hausinger and the other officers did not need to provide the

14

*Miranda* warnings to Wolter, and the trial court did not err by admitting the statements Wolter made to the officers at the scene of the stop.

Nevertheless, Wolter contends that two factors transformed the traffic and *Terry* stop into a custodial detention requiring *Miranda* warnings: the evidence that police gathered and the fact that police took his license and did not give it back to him before his arrest. These arguments fail to persuade.

Wolter's claim that the detention became custodial because police had gathered evidence against him improperly focuses on the subjective intents of the stop's participants. The test used to determine whether police have taken a suspect into custody for purposes of *Miranda* is objective. *Berkemer*, 468 U.S. at 442. "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," but otherwise are irrelevant to our review of whether an individual is in custody. *Stansbury v. California*, 511 U.S. 318, 325, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994); *Berkemer*, 468 U.S. at 441-42. Whatever evidence police had, and whatever their suspicions, they never communicated to Wolter that he would be arrested for any of these things until they actually took him into custody. Thus, their knowledge or suspicions were irrelevant to whether he was effectively in custody. Even if Wolter correctly believed that police would arrest him given what they knew, that belief is also irrelevant. *Stansbury*, 511 U.S. at 323 (detainee's subjective belief irrelevant to issue of custody).

Instead, we look to the objective circumstances of the stop, and, on balance, they do not suggest that a reasonable person would have "gauge[d] the breadth of his or her 'freedom of action'" to be restricted to the degree associated with formal arrest. *Stansbury*, 511 U.S. at 325

15

(quoting *Berkemer*, 468 U.S. at 440). The officers did not physically restrain Wolter, either with handcuffs or by placing him in a police vehicle. *State v. Rehn*, 117 Wn. App. 142, 155, 69 P.3d 379 (2003). Nor did they unholster their weapons. *State v. Marshall*, 47 Wn. App. 322, 326, 737 P.2d 265 (1987). Further, police did not order Wolter to obey any commands: they only asked him to voluntarily undergo field sobriety tests and to consent to the search of his truck. *State v. Ustimenko*, 137 Wn. App. 109, 116, 151 P.3d 256 (2007). Nor does Wolter contend that he requested and was denied permission to leave during the stop. Finally, the scope and duration of the stop, as already noted, was reasonably related to its legitimate purpose of determining if Wolter or anyone else was in need of help and whether he may have been involved in a crime. A reasonable person in those circumstances would not believe that this was anything more than a *Terry* stop and would not understand himself or herself to be effectively under arrest during the stop.

Wolter's claim that his detention became custodial because police kept his license is also unavailing. A reasonable motorist "expect[s], when he sees a policeman's light flashing behind him . . . that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration." *Berkemer*, 468 U.S. at 437. Police could unquestionably take Wolter's license to check his identity. They could also detain him until they had verified he had no outstanding warrants. Since the police could validly keep Wolter on scene while they verified a lack of arrest warrants without making the detention custodial, they

16

could keep his license while they ran those checks without making the situation custodial. *See* *Berkemer*, 468 U.S. at 437-38; *State v. Ferguson*, 76 Wn. App. 560, 886 P.2d 1164 (1995).[7]

Wolter makes two further arguments of error related to the CrR 3.5 hearing. First, he contends that the trial court erred because it "made no finding that the State proved a reasonable person in [his] position would have felt he was not being held by the police to a degree associated with arrest." Br. of Appellant at 24. Specifically, Wolter claims that by failing to do so, the trial court applied the wrong legal standard. Whether a reasonable person would have felt that he or she was effectively in custody under the facts present here is a question of law, not of fact. *Thompson*, 516 U.S. at 112-16; *State v. Lorenz*, 152 Wn.2d 22, 36, 93 P.3d 133 (2004). Any trial court findings would have been superfluous on review of the custody question. *Thompson*, 516 U.S. at 112-16. The trial court did not err.

Wolter also contends that the trial court erred in finding that police arrested him for the out-of-state warrant because they "had probable cause to arrest him for negligent driving from close to the inception of the stop." Br. of Appellant at 27. Hausinger testified that he arrested Wolter for both negligent driving and the out-of-state warrant, meaning the trial court's finding is correct, if incomplete. Regardless, the fact that police had probable cause to arrest Wolter before they did so is irrelevant to whether he was in custody. *State v. Harris*, 106 Wn.2d 784, 789-90, 725 P.2d 975 (1986); *see Stansbury*, 511 U.S. at 323 (citing *Beckwith v. United States*, 425 U.S. 344, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976)).

---

[7] In *Ferguson* police appear to have taken and kept Ferguson's license, but the court held that he was not in custody for purposes of *Miranda*. 76 Wn. App. at 563, 568. Ferguson apparently did not argue that the taking and keeping of the license made the detention custodial, so it is not precedential, but it is instructive given that Division One of our court found that Ferguson was not in custody after its de novo review of the issue.

The totality of the circumstances shows that Wolter's detention was not custodial until Hausinger announced he was arresting him, handcuffed him, and placed him in a squad car. Without custody, questioning cannot constitute custodial interrogation and *Miranda* is not implicated. We hold that the trial court properly admitted the statements he made to officers during the detention.

D.    The Interview

Wolter next contends that the trial court erred by admitting statements he made during his interview with detectives after his arrest. Specifically, he contends that the statements were inadmissible because he made them after he requested that police provide him with counsel. We hold that the officers honored Wolter's limited assertion of his right to counsel and that *Miranda* did not require the exclusion of the statements.

A defendant may assert his or her right to counsel in a limited fashion. *Connecticut v. Barrett*, 479 U.S. 523, 529-30, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987). Where the police honor a limited assertion of the right to counsel, *Miranda* does not require suppression of the statements they obtain from the defendant. *Barrett*, 479 U.S. at 529-30.

Wolter asserted his right to counsel in a limited way. He asked that the police provide him counsel before taking his clothing as evidence and then explicitly stated his willingness to otherwise answer questions. The police honored his limited request for counsel, and therefore his "right to choose between silence and speech," the right guaranteed by *Miranda*. 384 U.S. at 369; *Barrett*, 479 U.S. at 529. Wolter "chose to speak." *Barrett*, 479 U.S. at 529. The trial court properly admitted his statements. *Barrett*, 479 U.S. at 529-30.

No. 45041-1-II

## II. REMOVAL OF THE JUROR

Wolter next claims that the trial court "interfered with [his] right to a jury trial by removing a seated juror who was not biased, partial, or unable to serve." Br. of Appellant at 12. We disagree.

A.     Applicable Legal Principles and Standard of Review

The State and criminal defendants both have the right to trial before an impartial jury. WASH. CONST. art. I, § 22; U.S. CONST. amend. VI; *State v. Hughes*, 106 Wn.2d 176, 185, 721 P.2d 902 (1986) (citing *Hayes v. Missouri*, 120 U.S. 68, 70-71, 7 S. Ct. 350, 30 L. Ed. 578 (1887)). The jury must therefore be "free[] from . . . bias against the accused and for the prosecution, but [also] free[] from . . . bias for the accused and against the prosecution." *Hughes*, 106 Wn.2d 185. The guarantee of an impartial jury does not, however, entitle the State or a criminal defendant the right to trial by a "particular juror or by a particular jury." *State v. Gentry*, 125 Wn.2d 570, 615, 888 P.2d 1105 (1995).

We review the trial court's dismissal of a juror for an abuse of discretion.[8] *State v. Depaz*, 165 Wn.2d 842, 852, 204 P.3d 217 (2009). Both statute and court rules constrain that discretion. *See Ottis v. Stevenson-Carson Sch. Dist. No. 303*, 61 Wn. App. 747, 751-52, 812 P.2d 133 (1991). RCW 2.36.110 provides that

> [i]t shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention, or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

---

[8] The special constraints on the trial court's discretion to dismiss a juror after submitting a case to the jury are inapplicable, since the case had not yet been submitted. *See, e.g., State v. Elmore*, 155 Wn.2d 758, 778, 123 P.3d 72 (2005), and *Depaz*, 165 Wn.2d at 852-58.

19

CrR 6.5 provides that "[i]f at any time before the submission of the case to the jury a juror is found unable to perform the duties the court shall order the juror discharged." We have interpreted these provisions to "place a continuous obligation on the trial court to excuse any juror who is unfit and unable to perform the duties of a juror." *State v. Jorden*, 103 Wn. App. 221, 227, 11 P.3d 866 (2000).

Whether a juror is unfit because of bias or prejudice is a question of fact. *Ottis*, 61 Wn. App. at 753-54. Because the trial court observes the juror answering questions when asked about possible bias, we accord great deference to its factual determinations about a juror's ability to serve impartially. *State v. Rupe*, 108 Wn.2d 734, 749, 743 P.2d 210 (1987); *Ottis*, 61 Wn. App. at 755-56.

B.    Propriety of the Dismissal

The trial court had tenable grounds to find the juror had become biased. Although the juror did express that she thought she could follow the trial court's instructions during voir dire, she also stated that Wolter's contact with her friend had affected her thinking about the case. The trial court resolved the juror's contradictory answers about her ability to serve impartially by finding that the communication with her friend "seems to have had an effect on the juror's ability to be fair." 9A VRP at 1657. We defer to that finding.

The trial court had tenable reasons to excuse the juror. Once the trial court found that the communication had biased the juror, it had no discretion: it had to dismiss the juror under our interpretation of RCW 2.36.110 and CrR 6.5, *Jorden*, 103 Wn. App. at 227, in order to safeguard the State's right to an impartial jury. *Hughes*, 106 Wn.2d at 185. There was no abuse of discretion.

Wolter, however, contends that the trial court actually found that the juror had not committed misconduct, citing the portion of the record where the trial court dismissed the juror after telling her that "she had not 'done anything wrong.'"[9] Appellant's Br. at 17 (quoting 9A VRP at 1658). As just noted, the trial court explicitly found that the communication had biased the juror. In the portion of the record Wolter cites, the trial court stated, "I don't find that the juror, Juror Number 1, deliberately violated the order. Apparently, she misunderstood that she needed to be more aggressive in cutting off the conversation when it occurred" before finding she had become biased and ruling that "[f]or that reason, I will excuse her and seat the first alternate." 9A VRP at 1657. With this, the court was explaining that it had not found intent to disregard its orders, only that the juror had actually done so. The court did not find an absence of misconduct on the part of the juror.

Wolter also contends that the trial court abused its discretion in dismissing juror 1 because it denied his motion to dismiss other jurors who, he contended, showed greater bias than that juror. This argument fails for three reasons. First, RCW 2.36.110 and CrR 6.5 do not define bias or prejudice on a relative scale: once the trial court determines a juror is biased, it must dismiss the juror regardless of its decision about the bias of other jurors. *See Jorden*, 103 Wn. App. at 227. Second, Wolter's argument would only seem to prove that the trial court erred by not dismissing those jurors, but he has not assigned error to those decisions or asked that we

---

[9] In conjunction with this argument, Wolter contends that we should review the dismissal without deference to the trial court because the trial court did not explicitly state it was basing its finding on its observations of the juror during the voir dire related to the incident. But the trial court heard juror 1's contradictory answers concerning her ability to serve fairly and resolved the contradiction by finding the communication had biased her. That finding was inherently based on the trial court's observation of the juror's answers, and we must defer to its finding. *Rupe*, 108 Wn.2d at 749.

grant him relief based on any error in refusing to dismiss those jurors. Therefore, he has waived any claim of error to the seating of these other jurors. RAP 10.3(a)(4), (7). Finally, the potential jurors that Wolter claims exhibited more bias than juror 1 stated during voir dire that they could be fair and that they could hold the State to its burden of proof based on admissible evidence. The trial court heard the jurors' answers and found no bias, and, again, we defer to that determination. *Rupe*, 108 Wn.2d at 749.

### III. AGGRAVATING CIRCUMSTANCE

Wolter finally claims that (1) the trial court erroneously instructed the jury on one of the aggravating factors alleged by the State and that (2) the State failed to present sufficient evidence of the aggravator. Wolter's claims concerning the aggravator are moot because we cannot grant him meaningful relief.

Here, the jury found the existence of two aggravating circumstances. First, it found that Fredericksen was a witness in an adjudicative proceeding and that her murder related to her official duties. RCW 10.95.020(8). Wolter challenges this aggravator. Second, the jury also found that, at the time Wolter murdered Fredericksen, he knew that a court order prohibited him from "contacting [her], molesting [her], or disturbing [her] peace." CP at 326; RCW 10.95.020(13). Wolter assigns no error to this finding.

The jury's finding of a single aggravating circumstance elevates premeditated first degree murder to aggravated first degree murder. RCW 10.95.020. Consequently, regardless of our disposition of Wolter's challenge to the witness aggravator, Wolter would still be guilty of aggravated first degree murder because of the no-contact aggravator. RCW 10.95.020(13). RCW 10.95.030(1) would still require that he receive a sentence of life imprisonment without the

22

possibility of parole. Therefore, we can provide Wolter with no meaningful relief. His claims about the aggravator are moot and we decline to address them. *Yakima Police Patrolmen's Ass'n v City of Yakima*, 153 Wn. App. 541, 552, 222 P.3d 1217 (2009).

## CONCLUSION

The trial court did not err by admitting Wolter's statements to the investigating officers and had tenable grounds and tenable reasons for dismissing the juror. Further, even if we accept Wolter's arguments about one of the aggravating circumstances, we can grant him no relief regarding his sentence for aggravated murder, rendering his arguments moot. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, A.C.J.

We concur:

WORSWICK, J.

SUTTON, J.