**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MAY 23, 2024

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MAY 23, 2024

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 101777-4 |
| Appellant, | ) | |
| v. | ) | (consolidated with) |
| KIMONTI D. CARTER, | ) | |
| Respondent. | ) | |
| STATE OF WASHINGTON | ) | |
| Appellant, | ) | No. 101859-2 |
| v. | ) | EN BANC |
| SHAWN DEE REITE | ) | |
| Respondent. | ) | Filed: May 23, 2024 |

MONTOYA-LEWIS, J.— Kimonti Dennis Carter and Shawn Dee Reite ask

us to give depth to the sentiment that "'youth is more than a chronological fact.'"

*Miller v. Alabama*, 567 U.S. 460, 476, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)

(quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S. Ct. 869, 71 L. Ed. 2d 1

(1982)).  While both committed devastating crimes in their very young adult years, neither Carter nor Reite come before us as young people today, having both served decades in prison.  Today, as adults in their 40s and 50s, both ask this court to affirm their determinate sentences, after the superior courts recognized at resentencing that they demonstrated an ability to transform through deep reflection, accountability, and a commitment to change during their decades in prison.  We affirm.

"[Youth] is a moment and 'condition of life when a person may be most susceptible to influence and psychological damage,'" but "its 'signature qualities' are all 'transient,'" as youth are malleable and have a heightened capacity to transform who they are and how they walk through life.  *Id.* (quoting *Eddings*, 455 U.S. at 115; *Johnson v. Texas*, 509 U.S. 350, 368, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993)).  In this case, we are presented with two individuals who demonstrate that power of transformation.

Carter and Reite were both originally sentenced to mandatory life without parole (LWOP) sentences for aggravated first degree murders they committed between the ages of 18 and 20.  After they were sentenced, we held in *In re Personal Restraint of Monschke*, 197 Wn.2d 305, 307, 326, 482 P.3d 276 (2021) (plurality opinion), that such mandatory sentences were unconstitutional for their age group and that courts must consider a defendant's youthfulness.  Upon considering Carter's and Reite's mitigating qualities of youth and demonstrated commitment to change,

the superior courts resentenced both to determinate sentences. The State appealed both resentencing decisions.

Primarily at issue is whether the superior court had the statutory authority to impose determinate sentences for aggravated first degree murder. In addition, at issue is whether the court had authority to resentence Carter's other convictions, whether the court must vacate Carter's original sentence, and whether the court could impose community custody on Reite.

Consistent with our precedent and recognition of youth's heightened capacity for change, we hold that the superior courts had the statutory authority to impose determinate sentences for aggravated first degree murder for Carter and Reite, and with respect to Reite, that the superior court did not err, despite finding that her youth at the time did not substantially mitigate her crimes. We also hold that the superior court had the authority to resentence Carter on his other convictions and that the State may challenge the superior court's decision to vacate Carter's original sentence, but the superior court's decision was not error. Last, we hold that the superior court improperly imposed three years of community custody on Reite because this was unauthorized by statute for the crime of conviction. Therefore, we affirm the superior court that sentenced Carter. We also affirm the superior court that sentenced Reite for all but the imposition of community custody; on that matter,

3

we reverse and remand to the superior court only for purposes of striking the community custody term.

## I. FACTS AND PROCEDURAL HISTORY

In 1990, a jury convicted Reite of aggravated first degree murder. In 1998, again after a jury trial, Carter was also convicted of aggravated first degree murder.

### A.    Carter's Original Sentence

In 1997, two months after Carter turned 18 years old, he was riding in the passenger seat of a car with fellow gang members, when he shot a gun at a car he believed held rival gang members. Instead, the car was occupied by five people, none of whom were gang members. Three people in the other car were injured, and Corey Pittman was killed.

In 1998, a jury convicted Carter of aggravated first degree murder of Pittman, four counts of first degree assault with firearm enhancements for each of the individuals in the car with Pittman, and unlawful possession of a firearm. 1 Clerk's Papers (CP) (Carter) at 20-22. The superior court initially imposed the maximum sentence for all convictions to be served consecutive to each other, including

mandatory LWOP on the aggravated first degree murder conviction as required under RCW 10.95.030.[1] *Id.* at 20-21, 26, 38-39.

### B. Reite's Original Sentence

In 1988, when Reite was 20 years old, she shot and killed her mother and her mother's partner. Reite had been taking out credit cards in her mother's name and incurring debt, and when her mother discovered this, she insisted that Reite tell Reite's husband and that they pay off the debt. Reite wanted to avoid telling her husband because she was concerned that it would upset him and when he became upset, he tended to drink and become violent. Reite's actions were an attempt to cover up the theft.

In 1990, a jury convicted Reite of two counts of aggravated first degree murder. 1 CP (Reite) at 680-81, 683. The superior court initially imposed a sentence of mandatory LWOP. *Id.* at 709-10, 712.

### C. Our Decision in *Monschke*

In 2021, we held in *Monschke* that the life without release mandate from RCW 10.95.030 is unconstitutional when applied to 18- to 20-year-old offenders because it denies discretion to consider the mitigating qualities of youth in imposing

---

[1] RCW 10.95.0030 was amended in 2023. LAWS OF 2023, ch. 102, § 20. It deleted one subsection and renumbered subsection (3) to subsection (2) and deleted a sentence from former subsection (3). Because these amendments do not impact the statutory language relied on by this court, we refer to the current statute.

sentences, in violation of constitutional cruel and unusual punishment principles. 197 Wn.2d at 306-07, 326.[2]

> D.    Carter's Resentencing

Pursuant to *Monschke*, in 2021, Carter filed a CrR 7.8 motion asking the superior court to impose a determinate sentence on the basis that his youthfulness contributed to his offenses. After a hearing and oral ruling, the court issued its findings of fact and conclusions of law, resentencing Carter on all of the 1998 convictions based on several mitigating factors of youth and his rehabilitation in prison.

First, the superior court found that Carter committed the crime impulsively rather than as a result of a long-term plan. The court noted that the drive-by shooting "was a spur-of-the-moment, somewhat opportunistic event" where Carter mistook the occupants of the car as rival gang members and began to shoot indiscriminately. 1 Verbatim Rep. of Proc. (VRP) (Carter) at 88; Suppl. CP (Carter) at 802. There was no evidence that Carter considered the risk this behavior posed to neighboring residents, nor did he take any steps to conceal himself or prevent identification of the car they were in. Consequently, the court found that "the entire circumstance

---

[2] *Monschke* is a plurality decision, but the concurrence parted with the lead opinion only as to which exception of the time bar applied; thus, five justices agreed in result. *See* 197 Wn.2d at 326 (lead opinion), 329 (González, C.J., concurring). There is no dispute that Carter's and Reite's motions for resentencing here are timely.

reflects impetuosity, a clear failure to appreciate risks and consequences." 1 VRP (Carter) at 88; Suppl. CP (Carter) at 803.

Second, the court found that the nature of Carter's surrounding environment "put him at great risk of juvenile crime and materially contributed to his conduct." 1 VRP (Carter) at 89-91; Suppl. CP (Carter) at 803-04. Carter was raised by a single mother in the Tacoma Hilltop neighborhood, surrounded by violence, poverty, drugs, and gang activity. He was initiated into a gang at just 11 or 12 years old and remained involved as a means of survival. When his mother pushed Carter to go to school at age 12, other gang members arrived at her doorstep and told her that he was coming with them and not going to school. Carter never had the opportunity to go to school and instead spent his teenage years in juvenile detention facilities, where he later earned his GED.

Third, the court found that peer pressure affected Carter's culpability. As a gang member from the young age of 11, Carter was highly influenced by older members of the gang, which impacted his judgment and behavior.

The court also found that Carter has demonstrated "prodigious efforts and progress of rehabilitation, self-awareness and self-improvement" over the last quarter of a century. 1 VRP (Carter) at 93; Suppl. CP (Carter) at 805. For instance, he is a recognized leader among his peers as the President of the Black Prisoners' Caucus, he has created educational programs where incarcerated individuals teach

classes to other incarcerated individuals to obtain college credit, and he has organized youth summits to talk about crucial steps to build stronger relationships and support for justice-impacted youth. Carter's commitment "to understanding and owning his own behavior and embarking on radical change was done at a time when there was no reason for him to expect that he would ever be released from total confinement." 1 VRP (Carter) at 93; Suppl. CP (Carter) at 805.

Likewise, Carter now recognizes the devastating impact of his actions. Corey Pittman was a beloved member of the Hilltop community who served as president of the Martin Luther King, Jr. Club and was selected as homecoming king and Afro King in high school. At the time he was killed, he was a college student home on summer break and had big dreams of becoming a lawyer to make a difference in his community. Carter has reflected on who Pittman was and what taking his life has meant for his family and community, and has carefully contemplated the motivations behind his work:

> When I think about the work that I am doing, I'm not doing this work because I want to be a hero. I'm doing this work because I want to make a difference.
> When I think about all of the things that Corey was, Corey was everything that I wasn't. He was a loving son, a respectable brother, a loving and supportive friend. I was a gang member who just ran the streets.
> . . . .
> As I stand before this Court, I want to make sure that Corey Pittman's family understands me, that I do these things and mention his name because this is my way of honoring him.
> I realize that I took something very precious from the Pittman

8

family. I know that the words that I say will never be able to replace his life. But I want them to know that I am trying everything that I can to help people make better choices in their life because people are dying out there, and I'm finding myself running across the people who did it every single day.

I realized that they're regretting those decisions mainly because they didn't have people to be able to help them make better ones. With the opportunity, that is exactly what I would do if I am given the chance to go back to the community.

1 VRP (Carter) at 85-86.[3]

As a result of the court's detailed findings, it imposed a determinate sentence of 280 months on the aggravated murder conviction. Suppl. CP (Carter) at 811. The court also resentenced Carter on the nonmurder convictions on the basis of the court's belief that it had discretion to consider mitigating circumstances associated with the defendant's youth as to all convictions under *State v. Houston-Sconiers*, 188 Wn.2d 1, 21, 391 P.3d 409 (2017). It imposed low-end sentences and community custody terms for the assault and unlawful firearm possession convictions. The sentence for assaults ran concurrent with the aggravated first degree murder sentence; and the sentence for the firearm enhancements ran concurrent with one another but consecutive to the aggravated first degree murder

---

[3] Carter's rehabilitation and leadership within the prison system was featured in the award-winning film *Since I Been Down* (Jimmy Lewis Productions 2020). This film tells the story of the impacts of the rising rates of incarceration in Tacoma, Washington, and is told through the eyes of the impacted community. In doing so, it showcases Carter's commitment to educating and transforming the lives of other justice-impacted individuals. For information on how to access the film, visit https://www.sinceibeendown.com/.

sentence. The court did not explicitly vacate the original judgment and sentence. Carter was later released pending the State's appeal.

### E. Reite's Resentencing

Also in 2021, pursuant to *Monschke*, 197 Wn.2d at 307, Reite filed a CrR 7.8 motion asking the superior court to impose a determinate sentence of 30 years followed by a term of community custody. The court made findings on each of the factors in *Houston-Sconiers*, 188 Wn.2d at 23, for evaluating the mitigating qualities of youth but was not completely persuaded that youthful characteristics were a substantial factor in Reite's crimes. Namely, the court noted that although this was a situation that "snowballed" out of control and Reite may have been immature, this was not impetuous as it related to planned financial crime against her mother. 1 VRP (Reite) at 169. Likewise, the court found that Reite had a "nurturing home environment," "[t]here was no peer pressure to commit the crime," and "[t]here was nothing about her youth that impacted her legal defenses." *Id.* at 169-71.

However, the court also specifically noted Reite's rehabilitation, finding that "she's genuinely seeming to have some recognition that she's responsible," she recognizes the impact of her actions and has "put it in some context in her life," and she "persevered" in her efforts at self-improvement "despite it being hopeless, or seeming so." *Id.* at 155. Additionally, the court explained that Reite seems to have made progress and committed to improving herself, which is difficult to do under

the circumstances. During Reite's decades in prison, she took every possible class—"Peace Talks, Alternatives to Violence, Mindful Meditation, Finding Your Voice, Beyond Violence, [and] Depression and Wellness"—and completed each one to the best of her abilities. *Id.* at 122. She has also been a peer support person for the prison for the last several years.

> Reite has also reflected on the impacts of her actions:

> [I]t didn't affect me, the enormity of my actions, for several years. I was so caught up in the grief that I had over my mother's death that I was unable to see that the damage that I caused to the Wise family. And it took me years working through therapy with that with my counselors at the prison to be able to come to terms with that and to realize that I left a son without a father and nephew without an uncle, a brother, a sister, a mother. I left them all without their family member. And that has been—that, on top of my mom, has been the greatest loss that I've had. It's not my freedom that's been the loss. It's been the loss of the —to those family members and to the people that loved them and that cared for them.

*Id.* at 121. Others, including a lifelong friend, also testified to Reite's rehabilitative efforts, describing her as a vastly different person than she was at the beginning of her incarceration. For instance, though the friend would have described Reite as "more on the selfish side" at 18 years old, she acknowledged that that piece of Reite is gone and Reite is much more in tune with who she is and "what it's like to be a

good person, what it's like to actually think about other people or think about other people first." *Id.* at 69, 72-73.

Consequently, the court resentenced Reite to consecutive 280-month sentences on each conviction and 36 months of community custody as an exceptional sentence. 2 CP (Reite) at 2208-09; 1 VRP (Reite) at 155, 161. Reite has since been released into community custody pending appeal.[4]

F.     The State's Appeals

The State appealed the resentencing decisions in both cases to the Court of Appeals, arguing primarily that determinate sentences are impermissible because no statute authorizes such a sentence for aggravated first degree murder. The State also argued with respect to Carter that *Monschke* did not authorize resentencing on the nonmurder convictions and that resentencing Carter without vacating the original judgment and sentence violated double jeopardy principles. With respect to Reite, the State also argued that in the absence of mitigating youth factors pursuant to *Houston-Sconiers*, the court had no basis to impose a sentence other than life without release. In addition, the State argued that the community custody term is invalid. The Department of Corrections (DOC) petitioned for postsentence review of the community custody term, and a Court of Appeals commissioner granted the State's

---

[4] Though Reite was now subject to a total of 560 months of confinement, she was released in 2022 based on the Department of Corrections' earned early release credit calculations.

motion to link the appeal and postsentence review. *In re Post-Sentence Review of Reite*, No. 57655-4-II; Ruling, *State v. Reite*, No. 57337-7-II (Wash. Ct. App. Oct. 10, 2022).

We transferred both appeals to this court, consolidated them, and retained both matters for decision. Ord. Granting Transfer & Consolidation, *State v. Carter*, No. 101777-4 (Wash. June 7, 2023) (consolidated with *State v. Reite*, No. 101859-2).

## II. ANALYSIS

We have held in multiple cases that children under the age of 18 are different. We have further held that young adults are different as well, based on well-established neurological science, sociological analysis, and legal principles. Since "'[c]hildren are different'" from adults, "our criminal justice system [must] address this difference when punishing children" by imposing adult sentences. *Houston-Sconiers*, 188 Wn.2d at 8 (quoting *Miller*, 567 U.S. at 480); *In re Pers. Restraint of Ali*, 196 Wn.2d 220, 225, 474 P.3d 507 (2020). Namely, sentencing children to LWOP is unconstitutional. *Miller*, 567 U.S. at 465 (mandatory LWOP unconstitutional for children under Eighth Amendment to the United States Constitution); *State v. Bassett*, 192 Wn.2d 67, 72-73, 428 P.3d 343 (2018) (LWOP categorically unconstitutional for children under article I, section 14 of Washington Constitution).

In *Monschke*, we recognized that 18- to 20-year-olds may demonstrate

youthful characteristics, so trial courts similarly must exercise discretion before sentencing them to die in prison under article I, section 14 of the Washington Constitution. 197 Wn.2d at 306-07, 328-29. "[T]rial courts must consider mitigating qualities of youth at sentencing and must have discretion to impose any sentence below" the otherwise applicable range. *Houston-Sconiers*, 188 Wn.2d at 21. The sentencing court must thoroughly explain its reasoning for imposing such a sentence, specifically considering the differences between youth and adults and how those differences apply to the case. *State v. Haag*, 198 Wn.2d 309, 321, 495 P.3d 241 (2021); *State v. Ramos*, 187 Wn.2d 420, 444, 387 P.3d 650 (2017). Namely, the court must consider the "'hallmark features'" of youth, "such as the juvenile's 'immaturity, impetuosity, and failure to appreciate risks and consequences.'" *Houston-Sconiers*, 188 Wn.2d at 23 (quoting *Miller*, 567 U.S. at 477). In addition to the mitigating qualities of youth, sentencing courts must also consider the facts of the particular case. *Haag*, 198 Wn.2d at 323-24.

We will not reverse a sentencing court's decision unless we find a clear abuse of discretion or misapplication of the law. *Id.* at 317; *State v. Blair*, 191 Wn.2d 155, 159, 421 P.3d 937 (2018). "'A trial court abuses its discretion when "its decision is manifestly unreasonable or based upon untenable grounds."'" *Haag*, 198 Wn.2d at 317 (quoting *State v. Delbosque*, 195 Wn.2d 106, 116, 456 P.3d 806 (2020) (quoting *State v. Lamb*, 175 Wn.2d 121, 127, 285 P.3d 27 (2012))). Untenable grounds

consist of factual findings that are unsupported by the record. *Id.*; *Lamb*, 175 Wn.2d at 127. We review factual findings for substantial evidence, which ""'exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding."'" *Haag*, 198 Wn.2d at 317 (quoting *Delbosque*, 195 Wn.2d at 116 (quoting *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994))).

A.     Authority To Impose Determinate Sentences for Aggravated First Degree Murder

First, we must determine whether the sentencing courts in Carter's and Reite's cases erred in imposing determinate sentences for aggravated first degree murder. We hold that they did not err in doing so.

RCW 10.95.030(1) provides that "any person convicted of the crime of aggravated first degree murder shall be sentenced to life imprisonment without possibility of release or parole." The parties agree that under *Monschke*, 197 Wn.2d at 310-11, 327, the statute requiring *mandatory* LWOP is invalid for someone 18 to 20 years old because it precludes the trial court from considering the mitigating qualities of youth. The parties also agree that the statute is subject to a severability clause. *See* LAWS OF 1981, ch. 138, § 22.

Although the legislature has authority to set punishment for crimes, "legislative authority is ultimately circumscribed by the constitutional mandate forbidding cruel punishment." *State v. Fain*, 94 Wn.2d 387, 402, 617 P.2d 720

(1980).   When confronting a constitutional flaw in a statute, the doctrine of severability requires courts to "'try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.'"  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508, 130 S. Ct. 3138, 177 L. Ed. 2d 706 (2010) (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328-29, 126 S. Ct. 961, 163 L. Ed. 2d 812 (2006)).  Courts "must retain those portions … that are (1) constitutionally valid, (2) capable of 'functioning independently,' and (3) consistent with Congress' basic objectives in enacting the statute."  *United States v. Booker*, 543 U.S. 220, 258-59, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005) (citations omitted) (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S. Ct. 1476, 94 L. Ed. 2d 661 (1987)).

The parties disagree as to which portions of the provision should be severed. The State proposes the provision be read, "[A]ny person convicted of the crime of aggravated first degree murder shall be sentenced to life imprisonment ~~without possibility of release or parole~~."  Reply Br. of Appellant (Carter) at 16; Reply Br. of Appellant/Cross Resp't (Reite) at 22.[5]   Carter and Reite, however, propose the provision be read, "Any person convicted of the crime of aggravated first degree

---

[5] The appellant and respondent briefs were filed in the Washington State Court of Appeals, Division Two.  For clarity, we will cite to these briefs without the additional parentheticals in text. Carter's briefs are from Washington Court of Appeals No. 57162-5-II (2022-2023) and Reite's briefs are from Washington Court of Appeals No. 57337-7-II (2023).

murder ~~shall~~ [may] be sentenced to life imprisonment without possibility of release or parole." Resp't's Br. (Carter) at 18-19; Resp't's Answering Br. (Reite) at 12-13.

Stated differently, the State asserts that unless and until the legislature amends the statute, the statute requires a life sentence, and the only difference under *Monschke* is that the court has discretion as to whether or not the life sentence is with parole. According to the State, Carter's and Reite's determinate sentences do not fall within this construction of the statute, so their sentences must be vacated and remanded to the superior court for entry of a statutorily authorized sentence—life with parole or LWOP. On the other hand, Carter's and Reite's position is that the statute allows a sentence of any term—including LWOP—and the difference under *Monschke* is that there is no mandatory term now.

Both parties agree LWOP is available as the maximum sentence. LWOP may be imposed, but it must be discretionary, meaning the court must have other sentencing options. The State's position is that there is only one other option: life with parole. The minimum and maximum available sentences are both life imprisonment, and the court's only discretion is whether to allow the possibility of parole. It is unclear how the State sees life with parole working as a logistical matter, given that Washington is a state largely without parole.[6] *See* RCW 9.95.900 (parole

---

[6] For a brief review of the history of parole in Washington, see Sara Bernard, *Inside the Fight to Bring Parole Back to Washington State*, SEATTLE WKLY. (Feb. 22, 2017),

statutes inapplicable for offenses committed after July 1, 1984); *In re Pers. Restraint of Pullman*, 167 Wn.2d 205, 217, 218 P.3d 913 (2009) ("Washington State's system of parole effectively ended on July 1, 1984.").

For Reite, the State's main argument is that LWOP is still available and is the appropriate sentence for her. But the State fails to explain what the minimum available sentence should be for Reite or what such a sentence would entail as a practical matter. That recommendation would ignore the directives in *Monschke* and eliminate the discretion of the trial court, as exercised in her case. If we were to hold that the only discretion available to a trial court under the current statute was to impose an illusory potential for parole, we would effectively eliminate any useful discretion.

For Carter, the State's position is unclear as to whether he should be sentenced to life with parole or LWOP. *See* Br. of Appellant (Carter) at 39-42. The State cites to an Iowa Supreme Court case, *State v. Louisell*, 865 N.W.2d 590 (Iowa 2015). There, after *Miller* invalidated mandatory LWOP sentences for juvenile offenders, but before the Iowa Legislature had proposed new legislation, a trial court proposed a determinate sentence of 25 years with credit for time served or a life sentence parolable after 25 years. *Id.* at 595. The Iowa Supreme Court reversed and held that

---

https://www.seattleweekly.com/news/inside-the-battle-to-bring-parole-back-to-washington-state/[https://perma.cc/MZZ6-CBM7].

in order to respect the legislature's preeminence, the trial court could impose a parolable sentence where warranted, but it could not impose a determinate sentence, nor could it decide when eligibility for parole should commence after serving a specific term of years. *Id.* at 600. But there, Iowa state law included a parole scheme. *See id.* at 599, 602 (citing IOWA CODE § 902.1(1)). In Washington, after the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, there is no comparable parole scheme applicable. *See* RCW 9.95.900; *Pullman*, 167 Wn.2d at 217.

If we adopted the State's proposed reading of the statute, we would have no guidance as to when a person would become eligible for parole or the authority that would govern. The Indeterminate Sentence Review Board (ISRB) filed an amicus brief expressing this precise concern—it "point[ed] out that it presently lacks statutory authority to administer a 'life with parole' sentence in respect to *Monschke* class individuals such as Carter and Reite." Amicus Br. of ISRB at 6, 7.

This means the State's proposed severance would not solve the constitutional flaw in the statute. Under the State's reading, there is no functional alternative sentence, only LWOP. We would be remiss not to take the ISRB's concern very seriously as it is the body that would, theoretically, administer parole and supervise those under community custody or parole. Absent the authority do so, which the ISRB lacks, LWOP is still effectively mandatory.

Carter's and Reite's position is that there must be an alternative to LWOP to

make it discretionary, and, since RCW 10.95.030 does not place other limits on sentencing, the alternative sentence can be anything, including a determinate sentence. Under Carter's and Reite's proposed reading, once the word "shall" is severed and replaced with "may," no minimum sentence is specified. This means that the sentencing range would be zero to LWOP. Although such a range of zero to LWOP constitutes enormous discretion, there is no constitutional prohibition against such a broad range. Moreover, in the event a court orders a shockingly short sentence, that decision will be reviewed for an abuse of discretion.[7] Though we acknowledge it may seem peculiar that the minimum for people 18 to 20 years old is zero years, we decline to usurp the legislature's authority by attempting to draw the line for a term of years for this group; the legislature may decide to do so, within these constitutional boundaries, as they have done in response to prior decisions of this court. *See Free Enter. Fund*, 561 U.S. at 508; *Booker*, 543 U.S. at 258-59.[8]

If an indeterminate sentence of life with parole is unauthorized, then there is

---

[7] Courts are not without guidance as to what would be a manifestly unreasonable sentence and an abuse of discretion. The ranges for lesser degrees of murder can provide guidance for that discretion. RCW 10.95.030(2)(a) provides for indeterminate sentences for people under 18, with a minimum of 25 years and maximum of life imprisonment, and the Juvenile Justice Act of 1977, chapter 13.40 RCW, provides for sentences for other crimes committed by juveniles. Courts can look to what the sentence would be for a lesser or comparable crime when evaluating the appropriate length of a determinate sentence. In the instant cases, we affirm both determinate sentences and are not asked to question whether the superior courts abused discretion as to the length of the determinate terms it imposed.

[8] We agree with the ISRB that an indeterminate sentence of life with parole is not authorized by statute, and the statute would require rewriting, which is within the purview of the legislature, not the judicial branch. *See* Amicus Br. of ISRB at 6-7.

no meaningful alternative to LWOP as it relates to indeterminate sentences. This leaves LWOP and anything less than LWOP as the available options. The sentencing courts, in selecting a determinate sentence for a term of years, did not err by selecting the simplest solution and the cleanest severance approach. *See Free Enter. Fund*, 561 U.S. at 508; *Booker*, 543 U.S. at 258-59.

An unconstitutional statute can be cured through the judiciary under the doctrine of severability, which requires courts to sever unconstitutional (or otherwise invalid) portions and leave the remainder intact, wherever possible. *Free Enter. Fund*, 561 U.S. at 508. The State asks sentencing courts to wait for the legislature to act before resentencing anyone under *Monschke*, but Carter and Reite were serving unconstitutional sentences, and it is the court's responsibility to remedy such sentences by imposing a permissible sentence. *See id.*; *see also Fain*, 94 Wn.2d at 402. If the statute could not be severed and saved, the State might prevail in its argument. However, the State relies on a number of unpersuasive (and nonprecedential) cases for the assertion that only the legislature can cure the unconstitutionality we identified in *Monschke*. We can sever this statute and ensure it is constitutionally applied, and we conclude that is the case for both of these determinate sentences.

For instance, the State cites *State v. Davis*, 163 Wn.2d 606, 610-11, 184 P.3d 639 (2008), and *State v. Pillatos*, 159 Wn.2d 459, 469-70, 150 P.3d 1130 (2007),

21

where the trial courts adopted entirely new sentencing procedures when the statutory procedure was found unconstitutional. In *Davis*, 163 Wn.2d at 610-11, we held that a court lacks the power to submit a special interrogatory to the jury where it lacked authority to impanel a special sentencing jury. In *Pillatos*, 159 Wn.2d at 465, we held that a court lacks the power to impanel a jury where the legislature required a judge to make the findings justifying an exceptional sentence. Both of these cases involved trial courts that created procedures "out of whole cloth" and acted contrary to legislative directive. *State v. Hughes*, 154 Wn.2d 118, 151-52, 156, 110 P.3d 192 (2005) (holding that a procedure to impanel juries to find aggravating factors would usurp the power of the legislature), *overruled in part on other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006). Here, there is no usurping of the legislature, as the sentencing court modified the existing statute in the manner required by article I, section 14 of the Washington Constitution prohibiting cruel punishment, and consistent with severability law, *Free Enter. Fund*, 561 U.S. at 508—by severing the unconstitutional "mandatory" language and leaving the rest intact. In the absence of new legislation, the approaches taken by the sentencing courts were proper.[9]

---

[9] The State also relies on *State v. Hofstetter*, No. 45614-1-II, *consol. with* No. 46836-1-II, slip op. (Wash. Ct. App. July 21, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2045614-1-II%20%20Unpublished%20Opinion.pdf, for the assertion that a superior court has no statutory authority to impose a determinate sentence to remedy an unconstitutional mandatory LWOP sentence. As an unpublished case, *Hofstetter* is not binding on any court and can be offered only

22

Carter and Reite contend that the mandatory language in the provision should be severed and replaced with permissive language; thus, the statute would permit LWOP or anything less than LWOP. We agree and affirm Carter's and Reite's determinate sentences under this reading of the statute because the individualized, discretionary sentencing is consistent with our holding in *Monschke*, 197 Wn.2d at 307, 326.

In *Monschke*, we found *mandatory* LWOP unconstitutional as applied to a subset of 18- to 20-year-old defendants because it violated article I, section 14 of the Washington Constitution, which prohibits "cruel punishment." 197 Wn.2d at 310-12, 327. RCW 10.95.030 made LWOP mandatory and not discretionary, so the statute was unconstitutional in that respect, but not unconstitutional in its entirety. *Id.* at 325 ("statute's rigid cutoff at age 18 combined with its mandatory language creates an unacceptable risk that youthful defendants without fully developed brains

---

as persuasive. GR 14.1(a). There, juvenile defendant Hofstetter was convicted of aggravated first degree murder and sentenced to mandatory LWOP. Hofstetter requested resentencing after *Miller*, 567 U.S. 460, was decided, but before the passage of the *Miller*-fix statute. *Id.* at 1-2. The trial court imposed a determinate sentence of 40 years with a lifetime of community custody, and on appeal, the Court of Appeals remanded the case for resentencing, finding the pre-*Miller*-fix sentence unlawful as the trial court did not have authority to impose a sentence not based on statute. *Id.* at 1-3. The *Hofstetter* court had no need to conduct a severability analysis because the legislature amended the applicable sentencing statute, RCW 10.95.030—requiring resentencing for all juveniles convicted of aggravated murder—while Hofstetter's appeal was pending. *Id.* There was no need for the court to determine what sentence other than mandatory LWOP would be lawful because, on remand, the *Miller*-fix statute governed Hofstetter's sentence. Once the legislature enacted the *Miller*-fix and required resentencing, the sentence both Hofstetter and the State challenged was inconsistent with the new statutory requirement. *See* RCW 10.95.030(2). That is not the situation in Carter's or Reite's cases.

will receive a cruel LWOP sentence"). *Monschke* emphasized the importance of permitting trial courts to have discretion in sentencing those between the ages of 18 and 20, finding that "[j]ust as courts must exercise discretion before sentencing a 17-year-old to die in prison, so must they exercise the same discretion when sentencing an 18-, 19-, or 20-year-old." *Id.* at 329. Replacing "shall" with "may" permits such discretion. *See, e.g.*, *In re Elliott*, 74 Wn.2d 600, 607, 446 P.2d 347 (1968) (plurality opinion) ("'The word 'shall' must … be construed as permissive when the statute can thereby be upheld, if a construction to the contrary would render it unconstitutional.'" (quoting 82 C.J.S. *Statutes* § 380 (1953))); *see also Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council*, 165 Wn.2d 275, 299, 197 P.3d 1153 (2008) (same).

The State's proposed reading directly conflicts with the fundamental basis of *Monschke*, 197 Wn.2d at 310-11, 327, which is to allow superior courts individualized discretion to consider the mitigating factors of youth. Leaving the mandatory language intact denies superior courts of such discretion to impose an appropriate sentence in many circumstances. *See id.* Our juvenile jurisprudence recognizes that young adults may make impulsive decisions and lack the ability to consider the impacts of those decisions; further, we have recognized that such impulsivity may give way, over years, to thoughtful, mature, and accountable adults who, despite being incarcerated for decades, have grown into adults capable of

comprehending the impact of their actions. The promise of individualized discretion cannot be illusory. When no statute authorizes the ISRB to release persons convicted of aggravated first degree murder and LWOP is the only available sentence left, as the State argues we should conclude, such judicial discretion is nonexistent. *Cf. id.* at 329 (requiring courts to exercise discretion when sentencing an 18, 19, or 20 year old to "to die in prison"). [10]

B.      Superior Courts' Analysis at Resentencing Hearings

When we granted relief in *Monschke*, we remanded "for a new sentencing hearing at which the trial court must consider whether each defendant was subject to the mitigating qualities of youth." *Id.* The judges at Carter's and Reite's resentencing hearings appropriately considered just that to reach their determinate sentences.

The mitigating qualities of youth recognized in *Miller* and *Houston-Sconiers* are the defendant's "'immaturity, impetuosity, and failure to appreciate risks and consequences,'" as well as "the nature of the juvenile's surrounding environment and family circumstances," "'the way familial and peer pressures may have affected'" them, and "any factors suggesting that the child might be successfully rehabilitated." *Houston-Sconiers*, 188 Wn.2d at 23 (quoting *Miller*, 567 U.S. at

---

[10] Additionally, the State's proposed reading of the statute would render the minimum term of incarceration for triggering a parole hearing unclear, since RCW 10.95.030 does not provide a minimum term before parole or release is possible.

477). Youth is a time of life where people are susceptible to influence, which is accompanied by a heightened capacity for change. *Miller*, 567 U.S. at 476, 479; *Eddings*, 455 U.S. at 115; *Johnson*, 509 U.S. at 368.

Courts must "consider the *capacity* for rehabilitation when making an initial sentencing decision" involving LWOP, but "evidence of *actual* 'demonstrated maturity and rehabilitation' is generally considered later," when determining whether a defendant "who is up for parole should be given early release." *Ramos*, 187 Wn.2d at 449 (internal quotation marks omitted) (quoting *Miller*, 567 U.S. at 477-79). Considering such evidence of rehabilitation "is a question we leave to the discretion of the trial court in each case." *Id.* In Carter's case, the superior court acknowledged the mitigating qualities of youth and the impact these qualities had on Carter's decision-making. Specifically, the court considered that when Carter committed the crime, he did not even attempt to conceal himself as he indiscriminately shot into another car, nor did he verify that the people he thought were in the car were actually there. The court also considered how Carter's surrounding environment and difficult circumstances rendered him vulnerable and resulted in peer pressure, as he grew up in a neighborhood full of violence, poverty, drugs, and gang activity. Older gang members brought him into a gang by force at 11 years old, prevented him from attending school, and gave him no option to escape alive. Moreover, the court considered Carter's profound commitment to

26

rehabilitation, personal growth, and the empowerment of others to commit to the same. Finally, the court and Carter directly addressed the devastating impact of Carter's actions on Pittman's family and community. *E.g.*, 1 VRP (Carter) at 85-86 ("I realize that I took something very precious from the Pittman family. I know that the words that I say will never be able to replace his life."). In the process of owning this devastation, Carter has dedicated his life to bettering himself and helping others improve their decision-making by sharing not only his own story but the story of his victim. As the resentencing court recognized, he undertook the vast majority of this work while in prison. In considering the totality of evidence, the court imposed a determinate sentence of 280 months (a little more than 23 years). We affirm and find that the superior court in Carter's resentencing exercised its discretion properly pursuant to *Monschke*, 197 Wn.2d at 329, by considering each of the mitigating factors of youth. Carter is evidence of the malleability of youth and the resulting heightened capacity for change. *Miller*, 567 U.S. at 476, 479.

Likewise, in Reite's case, the superior court conducted an analysis consistent with *Monschke* because it exercised individualized discretion by assessing the totality of the evidence, including her actual and sustained rehabilitation. The State argues that postsentencing conduct and remorse do not reduce a defendant's culpability at the time of the offense. We reject the State's argument and hold that the actions a defendant takes toward self-improvement postsentencing are relevant

at resentencing. Also, the defendant's later ability to understand and take responsibility for what they did and its effects is consistent with our understanding of the features of youth—though youth is accompanied by immaturity, impetuosity, and failure to appreciate risks and consequences, it is also accompanied by heightened capacity for change. *Miller*, 567 U.S. at 476, 479. The court did not err in considering Reite's demonstrated rehabilitation at resentencing.

This holding is consistent with *Haag*, 198 Wn.2d 309, where rehabilitation since the original LWOP sentence was a mitigating quality of youth. There, juvenile offender Haag was convicted of aggravated first degree murder and was sentenced to mandatory LWOP. 198 Wn.2d at 312-13. Pursuant to RCW 10.95.030, Haag was entitled to resentencing, where the court resentenced him to 46 years to life. *Id.* at 313. On appeal, we held that the trial court erred in emphasizing retribution over mitigation. *Id.* We recognized that predicting a young person's "future dangerousness is extremely difficult" and that "[f]or this reason, resentencing courts *must* consider the measure of rehabilitation that has occurred since a youth was originally sentenced to life without parole." *State v. Delbosque*, 195 Wn.2d 106, 121, 456 P.3d 806 (2020) (emphasis added). In *Haag*, for instance, we considered that Haag obtained a high school diploma while in prison, worked in the prison chapel and the kitchen, and became religious, which motivated him to help others. *Id.* at 314. His actions, maturity in prison, and remorse were mitigating factors that

28

accounted for the capacity for change and diminished culpability of youth. *Id.* 314-15.

Here, although the court acknowledged that the crime itself did not demonstrate impulsivity because it stemmed from planned financial crime and that Reite was raised in a positive home environment and was not subjected to peer pressure, the court did note that Reite may have been immature and that it was a situation that escalated quickly. The court also emphasized Reite's rehabilitation while in prison, with respect to both taking classes dedicated to inner peace, mindfulness, improving mental health, and alternatives to violence, and working with counselors to reflect on the enormity of her actions. Specifically, the court noted that she "persevered" in her efforts at self-improvement "despite it being hopeless, or seeming so." 1 VRP (Reite) at 155. Reite's lifelong friend also testified that Reite is no longer a selfish 18-year-old—she is much more in tune with what it means to put other people first. Moreover, at resentencing, Reite took accountability for being unimpacted by the enormity of her actions at the time of the crime and expressed that through years of therapy in prison, she has realized the pain she caused to everyone who loved her mother and her mother's partner. The effect on her family "has been the greatest loss that [she has] had. It's not [her] freedom that's been the loss. It's been the loss . . . to those family members and to the people that loved them and that cared for them." *Id.* at 121. Reite's concrete steps toward

29

personal growth and her current ability to reflect on the harm she caused indicate not only that she has become a mature and thoughtful adult but, more importantly for our purposes, indicate that her youthfulness impacted her decision-making at the time of the crime. Her rehabilitation demonstrates her diminished culpability and her great capacity for change at 20 years old, *see Miller*, 567 U.S. at 476, 479, which the superior court correctly found as a mitigating quality of youth sufficient for resentencing. *See Haag*, 198 Wn.2d at 314-15. In weighing the evidence as a whole, the court imposed consecutive 280-month sentences (a little more than 46 years).[11] Though this is a long sentence, Reite does not dispute it, and we find it is a rare case where a sentence of this length is appropriate because the detailed findings by the superior court comported with the requirements of individualized consideration of the mitigating qualities of youth. *Cf. Haag*, 198 Wn.2d at 329-30; *see also Ramos*, 187 Wn.2d at 429, 434-35. We affirm and conclude that this determinate sentence is consistent with *Monschke* because of the analysis the court did in terms of assessing the totality of the evidence presented on sentencing.[12]

The superior courts imposed these determinate sentences in accordance with

---

[11] The court also imposed 36 months of community custody, but this sentence is discussed separately. *See infra* Part II, Section E.

[12] As Reite's resentencing judge noted, Reite undertook efforts toward her rehabilitation even when there was no reason to expect or hope for a life outside of the prison system. Carter did so too and advocated for inmate access to improved educational services for others who would be released into the community, despite continuing to serve his own life sentence. Many of Carter's and Reite's efforts at their own rehabilitation occurred prior to any decision of this court that might lead to a resentencing and the potential of a life outside of prison.

Washington law and they did not abuse their discretion in determining Carter and Reite should be sentenced to less than LWOP.

> C.    Authority To Resentence Carter on Other Convictions

Before *Monschke* was decided, Carter also sought resentencing by personal restraint petition (PRP) in 2020, arguing that recent juvenile offender sentencing law should apply to him. *In re Pers. Restraint of Carter*, No. 54619-1-II (Wash. Ct. App. May 4, 2020). Specifically, Carter sought resentencing for both his aggravated murder LWOP sentence and his other sentences in light of *Houston-Sconiers*, 188 Wn.2d at 20-21, and *Miller*, 567 U.S. at 470. *Carter*, No. 54619-1-II (PRP). The PRP was stayed pending *Monschke*, and after *Monschke*, Carter filed his CrR 7.8 motion in superior court, requesting similar relief. The court concluded there were two bases to overcome the time bar and resentence Carter: the LWOP sentence was unconstitutional, RCW 10.73.100(2), and *Monschke* and *Miller* constitute significant changes in the law, RCW 10.73.100(6).

The State does not appear to challenge the length of the sentences actually imposed at resentencing for Carter's assault and firearm convictions but, rather, argues that the court erred in resentencing Carter on those convictions in the first place because no exception to the time bar applied for those counts. Specifically, the State asserts that when a petition is filed more than a year from the date of finality, whatever exception that permits the claim to be heard is narrow, as is review.

31

We reject this argument and instead follow our approach in *State v. Gilbert*, 193 Wn.2d 169, 171, 438 P.3d 133 (2019).

There, we required a resentencing court to consider exceptional sentences for other counts at the same time it corrected an unconstitutional LWOP sentence. *See generally id.* Defendant Gilbert was a juvenile offender convicted of aggravated murder, premeditated murder, and multiple other crimes. *Id.* at 171. For his aggravated murder conviction, he was sentenced to LWOP, along with a consecutive determinate sentence for the premeditated murder conviction. *Id.* When RCW 10.95.035 was enacted, requiring resentencing of any juvenile offender sentenced to LWOP, Gilbert was resentenced. *Id.* The resentencing court believed it lacked authority to address anything other than Gilbert's sentence for aggravated murder and left intact the consecutive sentence for the premeditated murder conviction. *Id.* The Court of Appeals affirmed, and we reversed and remanded for resentencing on *all* counts. *Id.* We reasoned that in light of *Houston-Sconiers*, 188 Wn.2d at 9, the resentencing court was "required to consider Gilbert's youth as a mitigating factor and had discretion to impose a downward sentence." *Gilbert*, 193 Wn.2d at 176. Resentencing only on the aggravated murder conviction alone constituted error because it would prevent the court from exercising its discretion and considering the mitigating factors of youth. *See id.* In addition, trial courts view sentences as a whole in sentencing, considering the sentence on one count as relevant to the

sentence on another count (determining, for example, whether sentencing on one count runs concurrently or consecutively with other counts).

The trial court did not err in this resentencing. Once the aggravated murder sentence was vacated, the court had the discretion to resentence Carter on all counts. When a court vacates a sentence, it vacates the entire judgment. *In re Pers. Restraint of Skylstad*, 160 Wn.2d 944, 954, 162 P.3d 413 (2007) ("When a court reverses a sentence it effectively vacates the judgment because the '[f]inal judgment in a criminal case means sentence.'" (alteration in original) (quoting *Berman v. United States*, 302 U.S. 211, 212, 58 S. Ct. 164, 82 L. Ed. 204 (1937))). Likewise, when an appellate court orders "remand for resentencing," as in Carter's case, the superior court has broad discretion to resentence on all counts. *See State v. Toney*, 149 Wn. App. 787, 792, 205 P.3d 944 (2009) ("Toney's sentence was not final because our remand did not limit the trial court to making a ministerial correction."). This is relevant, particularly in a juvenile setting when we urge trial courts to recognize that "children are different" and more amenable to rehabilitation over the long term.

The State relies on *In re Personal Restraint of Kennedy*, 200 Wn.2d 1, 4-5, 513 P.3d 769 (2022), for the assertion that *Monschke* is not material to offenders who are not sentenced to mandatory LWOP. There, *Monschke* was not material to Kennedy because he was not subject to mandatory LWOP. *Id.* at 5. But here, Carter is subject to mandatory LWOP and *Monschke* is material to him. Further, Kennedy's

PRP was denied as a result of failing to satisfy the "newly discovered evidence" doctrine, *id.*; that is not an issue in this case. Finally, nothing in *Monschke* prevents the court from considering the mitigating factors of youth on all convictions.

Accordingly, if a court has the "full discretion" to consider the mitigating qualities of youth in imposing sentences, it applies to all counts. *See Houston-Sconiers*, 188 Wn.2d at 23.[13] The superior court found that the hallmark features of youth—including Carter's impulsivity, lack of appreciation of the risk to the five individuals in the car and surrounding neighbors, surrounding environment full of violence and scarce in educational opportunity, and peer pressure from older gang members from the time he was 11—impacted Carter's decision to indiscriminately shoot. This decision-making not only resulted in his aggravated murder conviction but his other convictions as well. Therefore, we hold that the superior court properly exercised its discretion to resentence Carter on all counts.

D.    Vacating Carter's Original Sentence

The State argues that the superior court violated proper procedure addressing

---

[13] *See, e.g.*, *Monschke*, 197 Wn.2d at 322-23 (citing Richard J. Bonnie & Elizabeth S. Scott, *The Teenage Brain: Adolescent Brain Research & the Law*, 22 CURRENT DIRECTIONS IN PSYCHOL. SCI. 158, 161 (2013) ("So far, neuroscience research provides group data showing a developmental trajectory in brain structure and function during adolescence and into adulthood."); Terry A. Maroney, *The False Promise of Adolescent Brain Science in Juvenile Justice*, 85 NOTRE DAME L. REV. 89, 94 (2009) ("Rather than raising deep and likely unsolvable questions about human agency, [neuroscience] simply reinforces the (once) noncontroversial idea that, as a group, young people differ from adults in systematic ways directly relevant to their relative culpability, deterrability, and potential for rehabilitation.")).

double jeopardy principles when it resentenced Carter in 2022 because the 1998 judgment and sentence was never vacated. Carter contends that the State cannot assert a double jeopardy violation on his behalf and the superior court did not err because the sentence was impliedly vacated when the parties signed and the court entered a joint order to resentence Carter. The court's decision was not error.

The State "owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated" because "[d]efendants are among the people the prosecutor represents." *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011); *see also State v. Case*, 49 Wn.2d 66, 71, 298 P.2d 500 (1956). When a trial judge considers a mistrial over the defendant's objection, prosecutors may interject in order to prevent a double jeopardy issue in retrial. *See, e.g.*, *State v. Robinson*, 146 Wn. App. 471, 478, 191 P.3d 906 (2008) (allowing the trial court to order a mistrial without defendant's consent when there is manifest necessity to circumvent a double jeopardy violation). Thus, we hold that the State's challenge to the superior court's decision not to vacate Carter's original sentence was not procedurally infirm, nor did it violate double jeopardy principles.

However, although the State may raise this issue, the State is incorrect that Carter's original judgment had never been vacated. The Court of Appeals granted Carter's PRP and ordered resentencing. *In re Pers. Restraint of Carter*, No. 54619-

1-II, slip op. (Wash. Ct. App. Oct. 18, 2022) (unpublished).[14]  The State claims that a written order vacating Carter's sentence was required.  Br. of Appellant (Carter) at 42-43.  The State is incorrect because the Court of Appeals' decision had the effect of vacating the judgment.  *See State v. Ferguson*, 76 Wn. App. 560, 561 n.1, 886 P.2d 1164 (1995) (absence of written findings is harmless error if oral ruling permits meaningful review); *State v. Clark*, 46 Wn. App. 856, 859, 732 P.2d 1029 (1987) (absence of written findings overlooked because oral opinion rendered error harmless).  A court is not required to explicitly "speak the magic words, 'this judgment is vacated,' either." *State v. Waller*, 197 Wn.2d 218, 228, 481 P.3d 515 (2021); *see also Skylstad*, 160 Wn.2d at 954 (finding that "revers[ing] a sentence . . . effectively vacates the judgment," even if it does not use the word "vacate" in its opinion); *State v. Harrison*, 148 Wn.2d 550, 561-62, 61 P.3d 1104 (2003) (stating that reversing a sentence indicates that "the finality of the judgment is destroyed" and the prior sentence ceased to be a final judgment).

Here, the State "objected to an order vacating the [original] sentence on the grounds that then Mr. Carter would have no sentence and he would have to be released." 1 VRP (Carter) at 16.  Even without a written order vacating the original sentence, the superior court issued an oral ruling clearly resentencing Carter:

---

[14] https://www.courts.wa.gov/opinions/pdf/D2%2054619-1-II%20Unpublished%20Opinion.pdf

"Rehabilitative justice, or perhaps in the case of Mr. Carter habilitative justice, is directed to be the overriding goal of penology. Based upon the foregoing, Mr. Carter, your sentence on the Aggravated Murder First Degree charge shall be 280 months of imprisonment." *Id.* at 96-97; *see also Ferguson*, 76 Wn. App. at 561 n.1. Furthermore, in anticipation of the resentencing hearing, the parties agreed to a joint order that set a resentencing date, which both parties and the judge signed. Resp't's Br. (Carter) at 31 (attached order setting resentencing hearing and related deadlines). The parties also signed the superior court's detailed judgment and sentence reflecting the resentencing. 1 CP (Carter) at 821, 829. These orders implied agreement to vacate the prior judgment.

Therefore, the superior court did not err and the oral ruling and other orders described above impliedly vacated the prior judgment. Consequently, there is no double jeopardy violation.

E.      Reite's Community Custody

The superior court also imposed three years of community custody on Reite.[15] DOC and the State challenged this sentence as unauthorized by statute. Reite concedes that there is no statutory authority specifying the imposition of community

---

[15] "Community custody" is a "portion of an offender's confinement in lieu of earned release time or imposed as part of a sentence . . . and served in the community subject to controls placed on the offender's movement and activities by [DOC]." RCW 9.94A.030(5).

custody and that its inclusion may be contrary to the doctrine of severability.

An exceptional sentence imposed pursuant to the SRA may include a longer length of community custody than the length of community custody otherwise provided by statute. *In re Postsentence Review of Smith*, 139 Wn. App. 600, 604, 161 P.3d 483 (2007). That said, an exceptional sentence does not allow the court to impose community custody where no statute authorizes it for the crime of conviction. *In re Postsentence Review of Leach*, 161 Wn.2d 180, 183, 163 P.3d 782 (2007). In *Leach*, the trial court sentenced an individual convicted of attempted second degree assault of a child to a term of community custody. *Id.* We concluded that community custody was not authorized by former RCW 9.94A.715(1) (2006), repealed by Laws of 2009, ch. 28, § 42, for the crime of conviction and that the trial court lacked authority to expend the list of eligible offenses beyond those prescribed by the statute. *Id.* at 185-87. Accordingly, we remanded for resentencing without community custody. *Id.* at 189. Similarly, here, we conclude that community custody is not authorized for the crime of conviction, nor is it a permissible exceptional sentence for an extended term of community custody where none is authorized in the first place.

Reite argues the community custody sentence should be valid because she stipulated to it, but she cites no authority for the proposition that parties can stipulate to a sentence not legislatively authorized. *See* Resp't's Answering Br. (Reite) at 33.

38

It is well settled that community custody may not be imposed when unsupported by statute for the crime of conviction, as in Reite's case. *See, e.g.*, *State v. Skillman*, 60 Wn. App. 837, 839, 809 P.2d 756 (1991) (trial court had no authority to impose community custody as an element of a sentence where it is not authorized by statute for that crime); *State v. Hudnall*, 116 Wn. App. 190, 197, 64 P.3d 687 (2003) (trial courts may impose exceptional community custody terms longer or shorter than the amount prescribed by the statute only when a statute authorizes community custody to begin with); *State v. Guerin*, 63 Wn. App. 117, 121, 816 P.2d 1249 (1991) (trial court had no authority to impose exceptional term of community supervision or placement where statute did not authorize either for the defendant's crime). The SRA, moreover, is inapplicable to Reite because she was convicted of aggravated first degree murder. *State v. Rogers*, 17 Wn. App. 2d 466, 477-78, 487 P.3d 177 (2021). Consequently, we reverse the superior court's imposition of community custody. We affirm the determinate sentence of 560 months, and on remand, we order the superior court to strike the community custody term and leave the remainder of the sentence intact.

## III. CONCLUSION

Youth have a heightened capacity for change. *Miller*, 567 U.S. at 476; *Eddings*, 455 U.S. at 115. Our ability to recognize the individual characteristics of those who enter the legal system must be one that values the lives of victims of

crimes and the lives of those who took them. When we are faced with crimes with life-changing, devastating impacts like these that are committed by young people, we have unique opportunities to both punish and change. Not every person will grow and change in positive directions, but it is possible; and our system employs judges to assess those characteristics that mitigate responsibility but do not excuse it and to support efforts at accountability and growth. Carter and Reite have demonstrated a profound commitment to taking accountability for the harm they caused, actively growing as individuals, and empowering others with the tools to do the same. The superior court did not err in considering the totality of the evidence when it came to Carter's and Reite's youthfulness; thus, we affirm the determinate sentences, reversing only Reite's community custody term. We hold that determinate sentences are permissible sentences under RCW 10.95.030(1) where LWOP cannot be mandatory under *Monschke*. We also hold that the superior court properly considered Reite's rehabilitation as a mitigating factor of youth at resentencing. Additionally, we hold that the court had the authority to resentence Carter on his other convictions. Moreover, we hold that though the State may raise a double jeopardy challenge based on a court's failure to vacate a prior judgment and sentence, there was no error here.

_____
Montoya-Lewis, J.

WE CONCUR:

_____     _____

_____     _____
                                    Gordon McCloud, J.

_____     _____
                                    Yu, J.

_____     _____
     Owens, J.                          Whitener, J.

41

No. 101777-4

GONZÁLEZ, C.J. (concurring) — I agree with the reasoning and results in the
majority opinion, with one exception that does not change the outcome. I
particularly agree that Carter and Reite were both entitled to resentencing, that the
trial court had the discretion to give a sentence other than life, and that we review
that sentence for abuse of discretion.

But in my view, it matters that the legislature set forth the minimum
sentence a child may receive for aggravated first degree murder: 25 years. *See*
RCW 10.95.030(2). The constitutionality of that statute has not been challenged
and must be presumed. It would be an abuse of discretion for a judge to sentence
an 18- , 19- , or 20-year-old to a sentence that is less than what a judge is required
to impose on a 14-year-old for aggravated first degree murder.

Kimonte Carter received less than the statutory minimum a 14-year-old
would have gotten. The sentencing court abused its discretion as to him. However,
given that the sentencing court also imposed a consecutive 60 month sentence for

1

firearm enhancements, I conclude that abuse of discretion was harmless since his entire sentence exceeded 25 years.

    With these observations, I respectfully concur.

_____
González, C.J.

*State v. Carter (Kimonti D.) & State v. Reite (Shawn D.)*

Nos. 101777-4
(consolidated w/101859-2)

MADSEN, J. (dissenting)—The majority opinion begins with an incorrect

presumption: *Monschke* held unconstitutional mandatory life without parole (LWOP) for

defendants aged 18-20 convicted of aggravated first degree murder. Majority at 2, 5, 14,

22-23 (citing *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 329, 482 P.3d 276

(2021) (plurality opinion)). I disagree for reasons I discuss below. However, even

assuming there is a holding in *Monschke*, the case only invalidated RCW 10.95.030(1)'s

mandatory language as applied to juveniles and young adults up to age 21. *Monschke* did

not and could not establish a constitutionally permissible sentence. *In re Pers. Restraint*

*of Forcha-Williams*, 200 Wn.2d 581, 591, 520 P.3d 939 (2022) ("'[F]ixing of penalties or

punishments for criminal offenses is a legislative function.'" (quoting *State v. Mulcare*,

189 Wash. 625, 628, 66 P.2d 360 (1937))).

What *Monschke* arguably did is create a sentencing gap. Because Washington

lawmakers have not yet filled that gap, this court must do so unless a majority of the

court recognizes that *Monschke* did *not* establish precedent. The court should reverse the

trial courts in these cases and remand to reimpose the original sentences. Failing that, we have created a problem; now we must fix it.[1]

Proceeding on the majority's assumption that *Monschke* established new precedent, I would fill the *Monschke*-gap by analogy, applying the *Miller*-fix[2] provision in RCW 10.95.030(2) to "any person convicted" of aggravated first degree murder in RCW 10.95.030(1).[3] Accordingly, young adult offenders (aged 18 to 20 years old) would receive the same standard range as juvenile offenders, permitting sentencing courts to consider youth as a mitigating factor. Applying the same "fix" language to juveniles under 18 and young adults up to age 21 makes sense because it would treat all young offenders the same and it matches the legislature's intent with regard to sentencing young offenders convicted of aggravated murder.

The majority takes a different approach, however. It employs an unbounded view of severability to RCW 10.95.030 that is unsupported by case law, and it creates a sentence for youthful homicide offenders that intrudes on the legislature's sole authority, resulting in juveniles under age 18 receiving potentially harsher sentencing consequences than older youths and adults. I respectfully dissent.

---

[1] Unless and until the legislature steps in with its own solution.

[2] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

[3] RCW 10.95.030 was amended in 2023, reorganizing the juvenile sentencing provisions from subsection (3) to subsection (2). LAWS OF 2023, ch. 102, § 20; codified at RCW 10.95.030(2). Carter and Reite were resentenced in 2023, prior to the effective date of the most recent amendment. In the interest of clarity, I refer to the most recent version of the aggravated murder statute and juvenile sentencing provisions, RCW 10.95.030(2).

BACKGROUND

Kimonti Carter and Shawn Reite were convicted separately of aggravated first degree murder as young adults. At age 18, Carter fired shots into a car, wounding two people and killing another person. Carter was convicted of aggravated murder with firearm enhancements and received the mandatory sentence of LWOP. At age 20, Reite killed her mother and her mother's partner in order to cover up debts Reite had incurred in her mother's name. Reite was convicted of two counts of aggravated murder and received the required LWOP sentence.

Citing *Monschke*, Carter and Reite sought resentencing to consider whether youth mitigated their culpability. The State agreed. 1 Verbatim Rep. of Proc. (VRP) (Carter) (July 8, 2022) at 15-16.[4] The respective sentencing judges for Carter and Reite imposed determinate sentences, finding youth was a mitigating factor for both. Carter was resentenced on all counts; the violent offenses and firearm enhancements were run concurrently as an exceptional sentence and consecutive to aggravated murder. Carter received 280 months for one count of aggravated murder; in total, 340 months. Reite

---

[4] In July 2022, Carter's defense attorney told the resentencing court that after *Monschke* "became final, the State agreed in a pending [CrR] 7.8 motion in this court that Mr. Carter was entitled to be resentenced. That was the agreement. That's why we set a sentencing hearing. . . . But, the previous prosecutor who made the agreement objected to an order vacating the current sentence." 1 VRP (Carter) (July 8, 2022) at 15-16. In October, after Carter's resentencing, the Court of Appeals noted that the State did not dispute resentencing under *Monschke* and had conceded that a time bar exception applied. *In re Pers. Restraint of Carter*, No. 54619-1-II, slip op. at 1 (Wash. Ct. App. Oct. 18, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054619-1-II%20Unpublished%20Opinion.pdf (citing RCW 10.73.100(6)); *see* Br. of Appellant at 45, 47; Reply to Resp't's Resp. to State's RAP 17.4(b) Emergency Mot. for RAP 8.3 Mot. to Stay Release from Custody Pending Appeal at 1 (same in Reite's case).

3

received a standard range 280 month sentence for two counts of murder, to be served consecutively, totaling 560 months. Reite also received an exceptional sentence of 36 months of community custody.

The State appealed on multiple grounds, arguing, among other things, that the trial court lacked authority both to impose determinate sentences and to resentence Carter on convictions other than murder. The State moved to transfer its appeal of the resentencing decisions for Carter and Reite to this court. We granted the transfer motion and consolidated the cases. Ord. Granting Transfer & Consolidation, *State v. Carter*, No. 101777-4 (Wash. June 7, 2023) (consolidated with *State v. Reite*, No. 101859-2).

ANALYSIS

The majority concludes that the courts below had authority to impose determinate sentences for Carter and Reite based on the simple application of our juvenile and young adult sentencing cases, specifically *Monschke*. *See* majority at 14-15, 22-30. The majority agrees with Carter and Reite that as young adult offenders convicted of aggravated murder and receiving mandatory LWOP, *Monschke* entitles them to resentencing. Majority at 14-15, 22-24; Resp't's Br. (Carter) at 16-18; Resp't's Answering Br. (Reite) at 10-12.[5] But it is far from clear that *Monschke* applies to young

---

[5] The appellant's and respondents' briefs were filed in the Washington State Court of Appeals, Division Two. For clarity we will cite to these briefs without the additional parentheticals in text. Carter's briefs are from Washington Court of Appeals No. 57162-5-II (2022-2023) and Reite's briefs are from Washington Court of Appeals No. 57337-7-II (2023).

adult homicide offenders as a class or that it stands for any proposition of law at all since only four justices agreed with the rationale espoused by the lead opinion.

Assuming, nevertheless, that *Monschke* made a holding, it is that RCW 10.95.030 is unconstitutional because it does not provide *discretion* for courts sentencing young adults to LWOP. 197 Wn.2d at 326. As a result, the mandatory LWOP in RCW 10.95.030 is inoperative for young adults and Washington lawmakers have yet to enact a sentence to reconcile that inoperative language. While I disagree that *Monschke* established new precedent that applies retroactively, rather than apply the majority's limitless view of severance, I would apply by analogy the *Miller*-fix provision for juveniles under 18 already present in the aggravated murder statute.

1. *Monschke*

Because *Monschke* is fundamental to Carter's and Reite's argument, we must determine what the case said.

In *Monschke*, this court considered whether the sentencing statute for aggravated first degree murder, RCW 10.95.030, was unconstitutional under the state or federal constitution's cruel and unusual punishment clause as applied to 19- and 20-year-old defendants. 197 Wn.2d at 306-07; U.S. CONST. amend. VIII; WASH. CONST. art. I, § 14. The court was split with no majority decision. Rather, the court divided into a lead opinion, concurrence, and dissent diverging on procedural and substantive issues. *See In re Pers. Restraint of Davis*, 200 Wn.2d 75, 81, 514 P.3d 653 (2022); *In re Pers. Restraint of Kennedy*, 200 Wn.2d 1, 22, 513 P.3d 769 (2022).

5

As a procedural matter, the *Monschke* petitioners argued they were exempt from the one year time bar because the statute they were convicted of violating was unconstitutional. RCW 10.73.100(2). The lead opinion, signed by three other justices, agreed. *Monschke*, 197 Wn.2d at 310. It noted that the aggravated murder statute was unique from other sentencing provisions. *Id.* at 309-10. RCW 10.95.030(1) requires the State to charge and the jury to find the defendant "guilty" of the same aggravated murder charge. Thus, the lead opinion concluded a challenge to the sentence in RCW 10.95.030(1) was a challenge to the statute the petitioners were "'convicted of violating.'" *Id.* (quoting RCW 10.73.100(2)).

The concurrence disagreed with the lead opinion's timeliness analysis. *Id.* at 329 (González, C.J., concurring). Instead, the concurrence sided with the dissent that RCW 10.73.100(2) is inapplicable to sentencing statutes. *Id*. Unlike the dissent, however, the concurrence would have held the petitions timely under RCW 10.73.100(6) based on a retroactive application of *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015), not on the constitutional grounds espoused by the lead opinion. *Id*.; *see also Davis*, 200 Wn.2d at 83; *Kennedy*, 200 Wn.2d at 22.

On the merits, the lead opinion concluded that mandatory LWOP *as applied* to 19- and 20-year-olds is unconstitutional. *Monschke*, 197 Wn.2d at 326; WASH. CONST. art. I, § 14. Observing no "meaningful" distinction between juveniles and those over the age of 18 based on the evolving neuroscience research, the lead opinion concluded that young adult defendants are entitled to *Miller*'s individualized sentencing to consider youth as a

6

mitigating factor. *Id.* at 321-25. The dissent disagreed, reasoning that the lead opinion elevated neuroscience over legislative enactments and would have held that petitioners were not analogous to juveniles. *Id.* at 331-32 (Owens, J., dissenting).

The lead opinion's four justices were persuaded that defendants over the age of 18 were constitutionally entitled to individualized sentencing under *Miller*. *Id.* at 321-27. The dissent's four justices disagreed. *Id.* at 341. The concurrence would have retroactively applied the holding in *O'Dell*, 183 Wn.2d at 698, that sentencing courts must be allowed to consider youth for offenders of any age. *Monschke*, 197 Wn.2d at 329. *O'Dell* was decided on procedural grounds, not constitutional grounds. *Id.* In total, five justices agreed in result—that the *Monschke* petitioners were entitled to a new sentencing hearing to consider youth. *Id.* (lead opinion and concurrence).

What then is *Monschke*'s holding? "[O]ur jurisprudence has been less than clear on how to determine what, if any, legal principles from a fractured opinion are precedential." *King County v. Vinci Constr. Grands Projets/Parsons RCI/Frontier-Kemper, JV*, 188 Wn.2d 618, 645, 398 P.3d 1093 (2017) (Madsen, J., concurring in dissent). The federal rule states that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (plurality opinion)); In re Pers. Restraint of Francis,

170 Wn.2d 517, 532 n.7, 242 P.3d 866 (2010).  This court has at times applied the *Marks* rule, while at other times preferred our own method:  "[*a*] *principle of law* reached by a majority of the court, even in a fractured opinion, is not considered a plurality but rather binding precedent."  *In re Det. of Reyes*, 184 Wn.2d 340, 346, 358 P.3d 394 (2015) (emphasis added) (citing *Wright v. Terrell*, 162 Wn.2d 192, 195-96, 170 P.3d 570 (2007) (per curiam)); *see also Vinci*, 188 Wn.2d at 644; Rachael Clerk, Comment, *Piecing Together Precedent: Fragmented Decisions from the Washington Supreme Court*, 94 WASH. L. REV. 1989, 2001-02 (2019) (discussing the inconsistent application of the Washington-specific method).

Under either test, only the specific petitioners in *Monschke* were entitled to resentencing to determine whether youth was a mitigating factor in the commission of their crimes.  *See Monschke*, 197 Wn.2d at 329 (lead opinion and concurrence); *Francis*, 170 Wn.2d at 532 n.7.  This is so because a majority of the *Monschke* court reached no principle of law.  *See Reyes*, 184 Wn.2d at 346.  The lead opinion anchored its analysis in the Eighth Amendment and neuroscientific studies; the concurrence, to the extent it expressed an opinion on the merits, appears to have relied on *O'Dell*.[6]

Here, the majority applies *Monschke*'s lead opinion as if it were precedential. Specifically, the lead opinion's conclusion that because neuroscientific studies identify

---

[6] The concurrence joined the lead opinion in result but "part[ed] company, however, with its analysis of the retroactivity of *State v. O'Dell*."  *Monschke*, 197 Wn.2d at 329 (González, C.J., concurring).  The lead opinion did not discuss *O'Dell*'s retroactivity.  *See also In re Pers. Restraint of Light-Roth*, 191 Wn.2d 328, 422 P.3d 444 (2018) (holding *O'Dell* was not a significant, material, and retroactive change in the law).

no meaningful difference between 17- and 18-year-olds, the legislature made an arbitrary decision to require LWOP sentences for young adults and such defendants should be protected by *Miller*. Majority at 23-24 (citing *Monschke*, 197 Wn.2d at 329). But, as mentioned, the lead opinion garnered four votes. Its reasoning is not precedential. *See Reyes*, 184 Wn.2d at 346; *Kennedy*, 200 Wn.2d at 24 (expressing skepticism that *Monschke*'s "lead opinion could be read as announcing a holding of this court").[7]

2. Sentencing for Aggravated First Degree Murder Post-*Monschke*

Because *Monschke* does not announce a new constitutional rule and has no majority holding, it is not retroactive and these postconviction resentencing requests should have been dismissed. RCW 10.73.090(2), .100. I would reverse the trial courts in both cases and remand for reimpostion of the original sentences.

Assuming however, as the majority does, that *Monschke* announced a holding, we must decide the permissible sentence for two offenders who fall into the gap between juveniles and adults.

RCW 10.95.030(1) states, in relevant part, "*any person* convicted of the crime of aggravated first degree murder *shall* be sentenced to life imprisonment without possibility of release or parole." (Emphasis added.) We are asked whether the language within this requirement can be severed. The majority concludes that it can by changing

---

[7] Carter and Reite argued in the Court of Appeals that "*Monschke* unquestionably applies retroactively." Resp't's Br. (Carter) at 18; Resp't's Answering Br. (Reite) at 12. This court has not made any such holding. *E.g.*, *In re Pers. Restraint of Davis*, 200 Wn.2d 75, 84, 514 P.3d 653 (2022) ("even *assuming* that *Monschke* is retroactive" (emphasis added)). Here, the State did not dispute that Carter and Reite were entitled to resentencing under *Monschke*.

the word "shall" to "may." I respectfully disagree. What the majority proposes is not a severance but a rewrite of the statute. Far more concerning, however, is that changing *shall* to *may* is not limited to 18- to 20-year-olds—it becomes the operative language for *any person* sentenced for an aggravated first degree murder conviction.

Generally, a statute does not fall entirely because one or more of its provisions is unconstitutional. *Mt. Hood Beverage Co. v. Constellation Brands, Inc.*, 149 Wn.2d 98, 118, 63 P.3d 779 (2003). If the balance of a statute can serve its purpose independently after the unconstitutional portion is removed, severance is appropriate. *Id.* (citing *State v. Williams*, 144 Wn.2d 197, 213, 26 P.3d 890 (2001)). Severance is meant to "'limit the solution to the problem,'" *excising* the problematic language while leaving the remaining provisions intact. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508, 130 S. Ct. 3138, 177 L. Ed. 2d 706 (2010) (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328-29, 126 S. Ct. 961, 163 L. Ed. 2d 812 (2006)). Severability is "a scalpel rather than a bulldozer." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. ___, 140 S. Ct. 2183, 2210, 207 L. Ed. 2d 494 (2020).

The basic test for severability in Washington is whether "the constitutional and unconstitutional provisions are so connected that the legislature would not have passed one without the other, or that the remainder of the statute is useless to accomplish the legislative purpose." *Mt. Hood*, 149 Wn.2d at 118.

Applying the narrowest view of severance, RCW 10.95.030(1) would read "any person convicted of the crime of aggravated first degree murder ~~shall~~ be sentenced to life

10

imprisonment without the possibility of parole." But severing "shall" creates more problems than it solves. Removing this auxiliary verb makes the clause grammatically unworkable. *McGowan v. State*, 148 Wn.2d 278, 295, 60 P.3d 67 (2002) ("The invalid provision must be grammatically, functionally, and volitionally severable." (footnote omitted)); *see also* Kenneth A. Klukowski, *Severability Doctrine: How Much of a Statute Should Federal Courts Invalidate*, 16 TEX. REV. L. & POL. 1, 30 (2011) ("A court now first considers whether the statute is still literally functional.").

Eliminating the entire LWOP requirement poses no grammatical concerns but is contrary to the purpose of the aggravated murder statute—it would remove the penalty for *all* offenders, not just the subset of identified persons in *Monschke*. *See Mt. Hood*, 149 Wn.2d at 118 (revised provision conflicted with legislative purpose). Perhaps more importantly, even under *Monschke*, LWOP is not categorically prohibited for juvenile offenders. *See State v. Anderson*, 200 Wn.2d 266, 269, 516 P.3d 1213 (2022) (stating that the Washington Constitution does not bar de facto LWOP sentence when a juvenile offender's crimes do not reflect mitigating qualities of youth). What to do?

I would apply our rules of statutory interpretation. As a practical matter, if we treat *Monschke* as precedential, we find ourselves interpreting a statute that fails to prescribe the permissible sentence for emerging adult offenders convicted of aggravated murder. Courts are constrained by the general rule that we "may not read into a statute matters that are not in it." *Kilian v. Atkinson*, 147 Wn.2d 16, 21, 50 P.3d 638 (2002) (plurality opinion). We may change the language if "it is 'imperatively required to make

11

it a rational statute.'" *State v. Taylor*, 97 Wn.2d 724, 728-29, 649 P.2d 633 (1982)

(quoting *McKay v. Dep't of Lab. & Indus.*, 180 Wash. 191, 194, 39 P.2d 997 (1934)).

When confronted with rationalizing a statutory gap, we may fill that gap by analogy,

provided we adhere to the fundamental principle of discerning and applying legislative

intent. *E.g.*, *Brutsche v. City of Kent*, 78 Wn. App. 370, 376-77, 898 P.2d 319 (1995)

("'What constitutes a reasonable time [under the Uniform Declaratory Judgment Act] is

determined by analogy to the time allowed for appeal of a similar decision as prescribed

by statute, rule of court, or other provision.'" (quoting *City of Federal Way v. King*

*County*, 62 Wn. App. 530, 536-37, 815 P.2d 790 (1991))).

Granted, the present case is not directly on point. It was not the legislature but this

court's application of *Monschke* that invalidates the LWOP requirement for 18- to 20-

year-old offenders. Yet the effect is the same. The omission of a term of confinement

for emerging adults creates the absurd situation where a homicide offender cannot be

punished at all, undermining the purpose of RCW 10.95.030. In such circumstances, this

court can supply the rationalizing language. *See Taylor*, 97 Wn.2d at 729-30.

The rationalizing language here comes from the aggravated murder statute itself.

*See id.*; *Brutsche*, 78 Wn. App. at 376-77. RCW 10.95.030(2) imposes determinate

sentences for juvenile offenders, commonly known as the *Miller*-fix statute. *See In re*

*Pers. Restraint of McNeil*, 181 Wn.2d 582, 586, 334 P.3d 548 (2014). Pursuant to the

*Miller*-fix statute, defendants convicted of aggravated first degree murder under the age

of 16 shall receive a maximum term of life imprisonment and a minimum term of 25

years.  RCW 10.95.030(2)(a)(i).  For defendants convicted of aggravated first degree

murder at the age of 16 but less than 18 years old shall receive a maximum of life

imprisonment and a minimum of no less than 25 years of confinement.  RCW

10.95.030(2)(a)(ii).  In setting the minimum term for juvenile offenders, a sentencing

court must take mitigating factors of youth into account.  RCW 10.95.030(2)(b).

The *Miller*-fix statute expresses the legislature's intent to set the penalty for

aggravated murder while recognizing that children are constitutionally different.  *See*

*Forcha-Williams*, 200 Wn.2d at 591 (recognizing that setting punishments for crimes is a

legislative function); *State v. Houston-Sconiers*, 188 Wn.2d 1, 18, 391 P.3d 409 (2017)

("children are different" (citing *Miller*, 567 U.S. at 480)).  Lawmakers have determined

that juveniles sentenced under RCW 10.95.030 shall be eligible for release, *not that they*

*be sentenced to a determinate number of years*.  *See* RCW 10.95.030(2).  *Monschke* said

the same thing for young adult offenders.

Assuming we are determined to give precedential effect to *Monschke*, we should

apply the *Miller*-fix statute to the *Monschke*-sentencing-gap in RCW 10.95.030(1) by

analogy.  Accordingly, "any person" convicted of aggravated first degree murder who

falls within the *Monschke*-age-range (18-20 years old) could receive a maximum term of

life imprisonment and a minimum term of 25 years.  RCW 10.95.030(1); RCW

10.95.030(2)(a)(ii); *Monschke*, 197 Wn.2d at 313, 329.

While this may not be the tidiest solution, it is the best solution available.  It

respects the separation of powers—the legislature has the sole authority to set criminal

13

punishments, which it has done for juvenile offenders and by analogy we can apply to *Monschke*-aged offenders here. This solution furthers the legislative intent—maintaining the harshest punishment for adult homicide offenders in RCW 10.95.030(1). And it incorporates *Monschke* without changing the language in the statute—interpreting "any person" convicted of aggravated murder aged 18 to 20 years old to be sentenced like their juvenile counterparts in RCW 10.95.030(2).[8]

The majority takes a different approach, opting to sever the unconstitutional language in RCW 10.95.030(1). At the same time, the majority takes the extraordinary step of *adding* language. Majority at 20. RCW 10.95.030(1) will now read, under the majority's interpretation, "'Any person convicted of the crime of aggravated first degree murder ~~shall~~ [may] be sentenced to life imprisonment without the possibility of release or parole.'" Majority at 16 (alterations in original) (quoting Carter's and Reite's proposed revision).

Carter and Reite claim that replacing a statutory term "breaks no new ground" in a severance inquiry. Resp'ts' Answer to Amicus Br. of Indeterminate Sent'g Rev. Bd. at 10. The majority apparently agrees. *See* majority at 16-22. This is a surprising observation in light of the preceding case law. Indeed that case law cuts the opposite way. Severance is not addition, it is subtraction. *United States v. Booker*, 543 U.S. 220, 245, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005); BLACK'S LAW DICTIONARY 1651 (11th

---

[8] *See State v. Bartholomew*, 28 Wn. App. 2d 811, 814-15, 539 P.3d 22 (2023) (resentencing a young adult offender under the exception for juvenile offenders between 16 and 18 in former RCW 10.95.030(3)(a)(ii) (2015)).

14

ed. 2019) (defining "severance" as "act of cutting off or severing"). After a court disregards an unconstitutional enactment, "we then determine what (if anything) the statute means" in its absence. *Lindenbaum v. Realgy, LLC*, 13 F.4th 524, 528 (6th Cir. 2021) (citing *Tilton v. Richardson*, 403 U.S. 672, 684, 91 S. Ct. 2091, 29 L. Ed. 2d 790 (1971)). "In short, severance is interpretation, not legislation." *Id.* at 530.

Adding words to a statute, as the majority does, is a step beyond severance for which I can find no support in our precedent or that of any other jurisdiction. *See City of Cleveland v. State*, 138 Ohio St. 3d 232, 237-38, 5 N.E.3d 644 (2014) (holding severance is permissible when the insertion of words or terms in a statute is not necessary to separate the constitutional part from the unconstitutional part and give effect to the former only); *State v. Bickford*, 28 N.D. 36, 147 N.W. 407 (1913) (same); *see Akin v. Dir. of Revenue*, 934 S.W.2d 295, 300 (1996) ("[Severability] has never allowed courts to insert words in a statute which were not placed there by the [legislature]."); *United States v. Reese*, 92 U.S. (2 Otto) 214, 221, 23 L. Ed. 563 (1875) ("The proposed effect [of severability] is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there. . . . To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one."); *People ex rel. Alpha Portland Cement Co. v. Knapp*, 230 N.Y. 48, 62-63, 129 N.E. 202 (1920)

15

("Our right to destroy is bounded by the limits of necessity. Our duty is to save unless in saving we pervert.").[9]

Setting aside this aggressive approach to severance, the majority makes a more fundamental mistake. It creates an entirely new criminal punishment that is not limited to young adults. The majority's revised statute makes LWOP discretionary and provides no minimum term. Majority at 19. *Monschke*-aged defendants convicted of aggravated murder could receive a sentence of zero to life without parole. *Id.* For offenders between 18 and 20 years old, sentencing judges could go below even what a juvenile offender would receive. *See* RCW 10.95.030(2)(a)(i)-(ii).

Indeed, the majority's rule contains no age limitation whatsoever. The new permissive sentencing scheme in RCW 10.95.030(1) will apply to *any* person convicted of aggravated first degree murder, including adults, and will allow such offenders to receive *any* sentence a judge crafts. In other words, an adult homicide offender could receive a sentence of zero months. The majority's rule creates more than an absurd result, it conflicts with the purpose of the original statute—harshly punishing homicide offenders. No provision in RCW 10.95.030 or related statutes provides for such a sentence. And, the legislature has yet to enact *any* sentence for *Monschke*-aged offenders.

---

[9] The majority cites *In re Elliott*, 74 Wn.2d 600, 607, 446 P.2d 347 (1968), as permitting appellate courts to replace "shall" with "may." Majority at 23. *Elliott* was a plurality decision, the lead opinion garnered only four votes and two other justices concurred solely in the result. Moreover, *Elliott* construed "shall" as permissive, it did *not* replace the term. 74 Wn.2d at 607-10. Nor was *Elliott* a severance case.

The majority cannot have it both ways. We cannot respect the separation of powers, acknowledging that the establishment of criminal sentences is the prerogative of the legislature, while creating those very sentences by judicial fiat. *Forcha-Williams*, 200 Wn.2d at 591; *Colvin v. Inslee*, 195 Wn.2d 879, 892, 467 P.3d 953 (2020) (the separation of powers "'serves mainly to ensure that the fundamental functions of each branch remain inviolate'" (quoting *Carrick v. Locke*, 125 Wn.2d 129, 135, 882 P.2d 173 (1994))).

Not to worry, the majority reasons, if "a court orders a shockingly short sentence, that decision will be reviewed for an abuse of discretion." Majority at 19. But how can this work? A court cannot know whether it is abusing its discretion if there is no statute or rule to apply. *See State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007) (a court abuses its discretion when it applies the wrong legal standard or bases its ruling on an erroneous view of the law).

Abuse of discretion rests principally on a court's *application of the law*. A court abuses its discretion if its decision is based on untenable grounds or made for untenable reasons, if it rests on facts unsupported in the record, or if it was reached by applying the wrong legal standard. *Id*. A decision is manifestly unreasonable if it falls outside the range of acceptable choices, given the facts and the applicable legal standard. *Id*.

Under the majority's rule, there is no applicable criminal sentencing law to apply and a judge has unlimited discretion when sentencing young adult homicide offenders,

indeed any offender, except a juvenile offender. *See* majority at 19.[10] The court in

Reite's resentencing looked to the Sentencing Reform Act of 1981 (SRA), ch. 9.94A

RCW, as a "touchstone" to craft a determinate sentence; at the same time, the court

acknowledged that the SRA did not apply to aggravated first degree murder. VRP

(Reite) (Oct. 3, 2022) at 148-50, 161-62. Abuse of discretion provides no answer to

whether a trial court can impose a determinate sentence absent enacting legislation.

The majority upholds the respective sentencing decisions for Carter and Reite. To

reach this result, the majority applies an unprecedented view of severance. As a court,

we "have 'the negative power to disregard an unconstitutional enactment,' but we cannot

re-write [the legislature's] work by creating offices, terms, and the like." *Seila*, 140 S.

Ct. at 2211 (citations omitted) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488, 43

S. Ct. 597, 67 L. Ed. 1078 (1923)). By adding terms unconsidered and unenacted by the

legislature, the majority rewrites RCW 10.95.030. Majority at 19-20; *Ayotte*, 546 U.S. at

329 (stating that courts must "restrain ourselves from 'rewrit[ing] state law to conform it

to constitutional requirements' even as we strive to salvage it" (alteration in original)

(quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397, 108 S. Ct. 636, 98 L. Ed.

2d 782 (1988))). Authority to write (and rewrite) a statute is a power reserved for the

---

[10] This boundless discretion has already led to strained results. In Carter's resentencing, the court ordered a determinate sentence that was less than that for the juvenile offender who drove the car during the drive-by shooting. *See State v. Powell*, 167 Wn.2d 672, 676-77, 223 P.3d 493 (2009) (plurality opinion) (Powell was resentenced to 407 months of confinement), *overruled in part on other grounds by State v. Siers*, 174 Wn.2d 269, 274 P.3d 358 (2012); 1 VRP (Reite) at 153 (the sentencing court stated "the best [it] can do is also a sentence of what [it] think[s] is just under all the circumstances.").

legislature, not the judiciary. *Forcha-Williams*, 200 Wn.2d at 591. In usurping this

function, the majority intrudes on the separation of powers. *Colvin*, 195 Wn.2d at 892.

With these considerations in mind, I respectfully dissent.

_____
Madsen, J.

_____
Johnson, J.

_____
Stephens, J.

19